NORDYKE & MARMON COMPANY v. KEHLOR, Appellant.

Division One, March 30, 1900.

1. **Contract:** COUNTER-CLAIM: CASE STATED. A agreed to construct for B. a flouring mill capable of producing flour five per cent better than a fifty-five per cent flour manufactured by C. B. was not to pay anything for putting up the mill until the condition was fulfilled by actual test. C.'s mill was not manufacturing fifty-five per cent flour, and could not do so without changing the method of operation and making necessary changes in the building, all of which C. refused to do. At the time of entering into the contract

both A. and B. believed that C. was making a fifty-five per cent grade of flour. A. discovered the error and requested B. to modify the contract, suggesting a seventy per cent grade that C. was making as a standard of comparison. B. declined to make any change in the percentage, whereupon A. refused to proceed with the contract. A. sued for the price of certain rolls furnished B., and B. answered with a counter-claim seeking damages for breach of the contract. *Held,* that A. was justified in abandoning the contract, and that he should have judgment on the counter-claim.

2. ————: UNENFORCIBLE. When it was discovered that the test could not be made, the obligation of the defendant to pay for the mill terminated, and inasmuch as the contract to build and the contract to pay for the mill were concurrent considerations, no contract remained that a court could enforce.

3. ————: ————: MISTAKE: MUTUALITY. In such case it is immaterial whether plaintiff or defendant furnished the mistaken information upon which the condition was predicated; the contract showing that it was assumed as a fact and was adopted by both plaintiff and defendant as the sole standard by which the performance of the condition was to be determined.

4. ————: IMPOSSIBLE CONDITION: NEGLIGENCE. When by mutual mistake a contract is founded upon a condition impossible to be performed, such contract is unenforcible, and it matters not that the party pleading the mistake had the means of knowing of the error and by diligence and care might have avoided it.

5. ————: VALIDITY: MEETING OF MINDS. It is essential to a valid contract that there be a meeting of the minds of the parties attempting to contract.

6. Intention: DOUBTFUL TERMS. The circumstances under which a contract is made and the object in view in making it should be considered in giving meaning to doubtful terms.

7. Quantum Meruit: ABANDONMENT. In this case the plaintiff was under no obligation on discovering that the test contemplated could not be attained, to proceed with his part of the contract and trust to a recovery on a *quantum meruit* for his services; he was justified in abandoning the contract upon such discovery.

8. ————: EXPRESS OR IMPLIED. Where the labor and materials are furnished by request and no price is agreed upon the law will imply an agreement to pay the reasonable value therof; but when the parties have by express contract agreed upon the amount of the consideration, in a suit on such contract they will be governed by the amount stated.

Appeal from St. Louis City Circuit Court.—*Hon. James E. Withrow*, Judge.

AFFIRMED.

*Chester H. Krum* for appellant.

(1) The record discloses no valid reason for the rescission of the contract by the respondent. (a) There was no impossibility of performance. Paradine v. Jane, 8 T. R. 267; The Harriman, 9 Wall. 172; Blight v. Page, 3 Bos. & Pull. 295; Barker v. Hodgson, 3 Maule & S. 271; Railroad v. Reichert, 58 Md. 261; Neil v. Reed, 9 Bing. 68; Harrison v. Railroad, 74 Mo. 371; Robson v. Log Co., 61 Fed. Rep. 893; Jones v. Anderson, 82 Ala. 202; Williams v. Miller, 6 Pac. Rep. 14. (b) There is no room for the application of the doctrine of avoidance by reason of a mutual mistake. Furthermore, respondent was guilty of gross laches. Brown v. Fagan, 71 Mo. 568. (c) The standard of comparison was not a grade of flour which Kelly & Lysle were making, but which they could make. Such standard need only to have been possible, upon the completion of the mill. (2) The theory of recovery upon the counterclaim, as advanced by appellant, was the correct theory. Kidd v. McCormick, 83 N. Y. 391.

*Everett W. Pattison* for respondent.

(1) Mistake may be such as to prevent any real agreement from being formed. When mistake is such as to exclude real consent, and so prevent the formation of any contract, there the seeming agreement is void. 15 Am. & Eng. Ency. of Law (1 Ed.), 625; Fonb. on Eq., 120; Kerr on Fraud, 431; Waite v. Leggrel, 8 Con. 195; Kingston v. Ellinge, 40 N. Y. 396; Koontz v. Cent. Bank, 51 Mo. 275; Matthews v. Kansas City, 80 Mo. 235; Bank v. Allen, 59 Mo. 313; Griffith v.

Townley, 69 Mo. 13; 1 Story, Eq., Jur., sec. 142; Miller v. Dunlap, 22 Mo. App. 97; Sachleben v. Heintz, 117 Mo. 520; Irwin v. Wilson, 45 Ohio, 426; Miles v. Stevens, 3 Pa. 21; 45 Am. Dec. 621. A contract assented to by one party on the faith of material misrepresentations by the other party will be rescinded at the option of the party injured, although the misrepresentations were made neither fraudulently nor negligently. 1 Whart. Cont., sec. 214; Yeater v. Hines, 24 Mo. App. 619. Where a contract has been materially induced by an innocent but substantial misrepresentation by one of the parties, the adverse contracting party may avoid—that is to say, rescind—the contract. Sachleven v. Heintez, *supra*; Hamlin v. Abell, 120 Mo. 188; Goddard v. Ins. Co., 108 Mass. 56. Should plaintiff have performed the contract relying on a recovery on a *quantum meruit?* No. Christy v. Price, 7 Mo. 430; Suits v. Taylor, 20 Mo. App. 166; Houck v. Bridwell, 28 Mo. App. 644; Moore v. Gaus Manfg. Co., 113 Mo. 98.

VALLIANT, J.—Plaintiff is a corporation engaged in manufacturing flouring mills and defendant is an owner and operator of such mills. Plaintiff sued for the price of certain rolls furnished to defendant for his mills, and defendant answered with a counter-claim. The cause was by consent referred to Arba N. Crane, Esq., to try all the issues. Upon the trial before the referee, the plaintiff's cause of action was confessed, but the controversy was over the counter-claim, which controversy is sufficiently stated in the report of the referee as follows:

"Shortly stated, the case is that by its contract plaintiff agreed to furnish a flouring mill, of a specified description, to be paid for when completed and proved capable of producing flour of a certain percentage. Before anything considerable was done towards performing the contract, the plaintiff abandoned it on the expressed ground that the contract was

inoperative, because the basis furnished by it for said percentage test was impossible. Later on the defendant obtained from Allis & Co., of Milwaukee, a flouring mill, located on the same site.

"The contract in question was entered into and dated May 28, 1892, between the plaintiff, as party of the first part, and the defendant and one E. E. Pierson, parties of the second part. Pierson was a miller residing in Lawrence, Kansas, and operating a flouring mill in that State. Before this suit was begun he assigned his interest in the contract to defendant Kehlor, whom I will hereafter refer to as the contracting party."

Then continuing the report sets out the contract *in haec verba*, which, without here copying, it is sufficient to say is to the effect that plaintiff agreed to furnish, within a certain period, all materials, machinery, etc., and erect "in as proper order as is known to science in the art of milling at the present time, and to deliver to them a flouring mill with an easy capacity of manufacturing fifteen hundred barrels of flour of all grades as specified hereinafter, combined, in every day of twenty-four hours run" according to specifications, etc. The contract concludes as follows:

"The meaning and intent of the above agreement is as follows:

"The party of the first part have agreed to build a flouring mill according to the specifications, etc., furnished by them, and which is guaranteed by them to be as complete and perfect a flouring mill, as far as construction, durability and easy working is concerned, as any in the United States, and to make at least the lowest percentage of flour mentioned hereafter as conditions of payment . . . . . . .

"And in consideration of the above, party of the second part agrees to pay for the same when the mill is completed and proved capable of producing not less than sixty per cent of Kansas hard wheat flour, fully equal in quality to the

best fifty-five per cent that Kelly & Lysle can make in their mill at Leavenworth, Kansas, as now constructed and operated from the same quality of wheat and the same yield which shall not exceed four and one-half bushels to the barrel of flour, the remaining forty per cent to be fully equal to Kelly & Lysle's remaining forty-five per cent in proportion according to grades contained in Kelly & Lysle's remaining forty-five per cent, sixty-five thousand dollars, as follows: $15,000 to be advanced when the machinery is ready for shipment, $17,000 to be advanced during the construction of the plant and as it progresses, $32,500 to be paid upon completion of the plant by the first party as provided above." [Then follow promises to pay $75,000 if the mill produces seventy-five per cent equal to Kelly & Lysle's best fifty-five per cent, and to pay $85,000, if it produces ninety per cent equal to Kelly & Lysle's best fifty-five per cent of flour.]

Further the report says:

"In his counter-claim the defendant states his view of the terms of the contract, and says that his motive in making it was his obligation to others to build a flouring mill at Shawnee on land acquired for that purpose. He also alleges his own readiness always to perform his part of the contract and says that, on the 5th day of July, 1892, the plaintiff definitely refused to perform, and never has performed its part of the contract. He alleges that the market value of the mill constructed and completed as agreed and conforming to the contract and guarantee would have been $150,000; that after the plaintiff had refused to perform its contract, defendant tried to get a mill constructed of the same description, but was unable to do so because the plaintiff alone was able to construct the mill on the plan called for by the contract. He lays his damages at $85,000. The reply of the plaintiff contains a general denial of all the allegations in the counter-claim except such as are specifically admitted by said reply. . . . . . . .

"In justification of the refusal of plaintiff to perform the

contract, it is in substance alleged in the reply that the contract was vitiated by a mistake in basing the flour percentage test on a fifty-five per cent of Kelly & Lysle's manufacture, the fact being that Kelly & Lysle never made and could not make flour of that percentage without first making changes in their mill, which, when solicited to do by the parties to this contract, they refused. That this test was put in the contract by the defendant who wanted to make a better flour than Kelly & Lysle—that plaintiff had no knowledge as to the grades of the Kelly & Lysle flour, but was informed by defendant and by Pierson that it was 55 per cent best grade. And this the plaintiff believed, or it would not have entered into the contract. When the mistake was discovered and it was found that Kelly & Lysle would not change their mill so as to run a fifty-five per cent grade, plaintiff asked the defendant to modify the contract in this particular of the percentage test, which defendant refused. Whereupon plaintiff declined to go on with the contract. The reply also states that defendant obtained a mill of the like kind, character and quality with that which plaintiff contracted to build, and that said mill has been erected and is now in operation on the land mentioned in defendant's answer, and is capable of producing not less than 1,500 barrels of flour in each twenty-four hours of continuous run........

"Proceeding now with the inquiry in hand there is no doubt that an error was made in designating in the contract the Kelly & Lysle product as a fifty-five per cent grade of flour, and it is proper to notice how this error happened to occur."

Then follows, in the report, a summary of the evidence on that point, and the evidence to show that Kelly & Lysle had not made and declined to make that percentage of flour. Then the referee says:

"Under date of July 1, 1892, the plaintiff wrote to the defendant that inasmuch as Kelly & Lysle made no fifty-five

per cent flour the percentage test should be changed, and suggesting a seventy per cent grade of Kelly & Lysle's manufacturing as the standard comparison.

"To this proposition defendant replied by letter to plaintiff under date of July 2, 1892, declining to make any change in the percentages. In answer to the latter letter the plaintiff wrote to the defendant under date of July 5, 1892, stating its views of the importance of the percentage test, and saying that "as you have refused to make any changes in this portion of the contract that would place us in as fair a position as we supposed we were when the contract was signed, we are forced to decline to proceed further with the contract.

"From the evidence thus briefly summarized I find that the selection of a fifty-five per cent grade of flour of Kelly & Lysle, as the basis for the test of the mill contracted for, was made on information originating with Pierson, and communicated by him to the plaintiff, and that this standard of comparison was insisted upon by the defendant, and was inserted by him in the contract, but was honestly believed by both parties to exist when the contract was signed. That in this belief both parties were in error, and in agreeing and contracting for the percentage test they acted under a mutual mistake of fact.

"This brings me to the consideration of the question whether the mistake under which the parties acted was fatal to the contract.

"Recurring to the testimony, it will be recollected that throughout the negotiations the idea prominent with the defendant was to obtain a mill that would compete with that of Kelly & Lysle. The mill to be built for him must make as good or better flour than Kelly & Lysle was making. I think it no exaggeration to say that this qualification or attribute of the mill to be built was a *sine qua non* with the defendant. It is therefore evident that to give effect to this purpose, a standard of comparison of the product of the com-

pleted mill with the flour made by Kelly & Lysle was indispensable, and it would seem to follow that if the provisions of the contract are adequate to effect the purpose mentioned, they are material and essential provisions."

Quoting again that paragraph in the contract hereinabove quoted, in regard to the conditions precedent to payment by defendant, the report continues:

"In similar language provision is made for increased pay for the attainment of greater percentages. These provisions are adequate, and, I think, more than adequate, to effect the purpose which the negotiations show that the defendant desired to accomplish, for they not only contain the guaranty of the plaintiff, but they make the defendant's promise to pay for the mill dependent upon the fulfillment by plaintiff of the percentage test based on fifty-five per cent product of Kelly & Lysle. Consequently, when it was found that the test could not be made, the obligation of the defendant to pay for the mill terminated, and inasmuch as the contract to build and the contract to pay for the mill were concurrent considerations, no contract remained that a court could enforce. It seems to me that this consequence clearly shows the importance of this percentage test in the contract, and my belief is that without this test the contract would not have been made."

The conclusion of the referee was that the plaintiff was justified in abandoning the contract and should have judgment on the counter-claim. The report was reviewed by the circuit court on exceptions filed which exceptions were overruled and the judgment followed accordingly, from which the defendant in due course has prosecuted this appeal.

The report summarizes the evidence on the question of the amount of defendant's damages in case he is entitled to recover, and gives the referee's conclusions thereupon, but the view that we take of the contract in question renders it unnecessary to review that part of the report.

This is an action at law; the plaintiff's reply to the

defendant's counter-claim does not seek, as in equity, a rescission or reformation of the alleged contract, but pleads at law that the contract on which the counter-claim is based was in effect no contract, that its own provisions defeated itself, that in aiming to stipulate a degree of excellence and efficiency to which the mill when completed should possess, a standard which it was assumed existed was chosen, by which alone the degree of excellence and efficiency intended to be contracted for, was to be tested and proven and the plaintiff's right to recover the contract price demonstrated, but that after the contract was signed it was discovered that the assumed standard had never existed and could not be obtained, therefore the plaintiff in its plea, said the contract was meaningless, and its performance, by its own terms, rendered impossible.

It is not charged in the pleadings that fraud was perpetrated or that there was any willful misrepresentation or concealment of a fact by either party, but there was considerable evidence to show who was responsible for the mistake in assuming that the best grade of the output of the Kelly & Lysle mills was a fifty-five percentage, and upon that point the referee found (and the evidence was sufficient to support the finding) that Mr. Pierson furnished the information upon which the contracting parties acted and they all supposed it was true. But in the trial of this issue at law, uninfluenced by any charge of fraud, it is immaterial who gave the information; the contract speaking for itself shows that it was assumed as a fact and adopted as the standard by which alone the plaintiff could prove that it had performed its contract and earned the price agreed on.

It is contended in behalf of the defendant that the plaintiff was negligent in not informing itself on this point as it might have done before entering into the contract. That would be a good answer to the plaintiff's plea if the contract was susceptible of performance and its performance when complete was susceptible of demonstration in the absence of

the fact assumed, and if the plaintiff were seeking in equity a rescission of the contract on the ground of mutual mistake, which was the case in Brown v Fagan, 71 Mo. 563, to which appellant refers. But the plaintiff is not seeking equitable relief against a contract susceptible of performance according to its terms, but its contention is that the alleged contract was attempted to be built upon a foundation which did not in fact exist, and therefore the attempt failed.

To appreciate the meaning of the test adopted, we must bear in mind what millers mean by the terms employed in this contract on that point. It seems that every flouring mill separates its product into two or more grades. Into the first grade it puts its best quality, which is called its "patent flour" and is the best product obtained by that mill from wheat handled by it. What is left of that wheat goes into inferior grades of flour. The skill of the miller is directed to getting the largest percentage compatible with desired excellence, of patent flour out of a given quantity of wheat. All patent flour in the market is not of the same quality. The quality may be influenced by the percentage of the product the miller sees fit to set apart for that grade. Therefore if a mill puts only fifty per cent of its product into its patent flour, that flour would be a better quality than if, using the same skill and machinery, the miller put seventy per cent of the product into it.

So that when it was stipulated in this contract that the mill to be constructed by plaintiff should be capable of producing sixty per cent of patent flour equal in quality to that of fifty-five per cent produced by the Kelly & Lysle mills, and that it shall be so proved as a condition to the plaintiff's right to receive the contract price, it is manifest that the parties considered that a very material and essential element in their undertaking.

And if their assumption was well founded, if the Kelly & Lysle mills were producing fifty-five per cent flour and

plaintiff had performed its contract by producing a mill of the standard degree of excellence stipulated, that fact was susceptible of demonstration in the manner agreed upon. But when it turned out that their assumption was unfounded, they were in the attitude of having contracted with reference to something that did not exist.  We can not conceive that the plaintiff intended to agree to furnish the mill and have his right to recover the contract price depending on an impossible test, nor can we conceive that the defendant in good faith accepted such an obligation.  They were both mistaken, and the contract which they intended to establish on that foundation falls when the foundation itself is discovered to have no existence.  And in such case it is immaterial that the party pleading the mutual mistake was negligent in seeking information.  [Koontz v. Bank, 51 Mo. 275; Third National Bank v. Allen, 59 Mo. 310; Griffith v. Townley, 69 Mo. 13; Matthews v. Kansas City, 80 Mo. loc. cit. 235; Pollock on Contracts, p. 412; Kingston Bank v. Eltinge, 40 N. Y. 391.]

The learned counsel for the appellant quotes from the Supreme Court of the United States:  "The principle deducible from the authorities is, that if what is agreed to be done is possible and lawful, it must be done.  Difficulty or improbability of accomplishing the undertaking will not avail the defendant.  It must be shown that the thing can not by any means be effected.  Nothing short of this will excuse nonperformance."  The Harriman, 9 Wall. 172.  And other authorities are cited in support of the same general principle therein announced, the correctness of which is not questioned.

But was this contract possible of execution?  If the Kelly & Lysle mills were producing fifty-five per cent patent flour, it would be no excuse to the plaintiff, if when it had exhausted its utmost skill it found it had failed to make a mill that would produce a sixty per cent patent flour equal in quality to the Kelly & Lysle fifty-five per cent product, because in such case the law will not recognize that the limit

in scientific attainment has been reached, and although the achievement promised may be beyond anything that had before been done, yet if the plaintiff saw fit to undertake it and condition its pay on its fulfillment of the promises, the law will give him no relief against his undertaking. But where he contracts to furnish a mill that will produce a result measured by a stated standard assumed to exist, when in fact no such standard did exist, the contract is impossible of fulfillment.

If the defendant in anticipation of the completion of his mill with a capacity as to quantity and quality to the stipulated test, had contracted to sell 1,000 barrels of flour equal in quality to the fifty-five per cent product of the Kelly & Lysle mill, and having, when the time came tendered that quantity of flour as in fulfillment of his contract and the purchaser refused it on the ground that it was not of the quality desired, how could the defendant in a suit to recover for a breach of the contract prove that the flour tendered was of the quality contracted for? There would be the same inherent infirmity in such contract that there is in the contract now in suit. It is an attempted contract assuming the existence of an essential fact which does not exist, and therefore there has been no meeting of the minds in reality, and no contract. [Gardner v. Lane, 9 Allen 492.]

It is contended that there was no mutual mistake in this matter. That if there was a mistake it was the mistake of the plaintiff alone. But the contract itself speaks upon that point, and speaks for both parties. It assumes that the fact existed and bases the contract on that assumption. Neither party could show by evidence *aliunde* that he knew that Kelly & Lysle were not making and could not make in their mill as then "constructed and operated" fifty-five per cent patent flour, without bringing his good faith into question.

There is some discussion in the briefs over the term "can make" in reference to the quality of flour to be produced by the Kelly & Lysle mills, the plaintiff's guaranty as to efficiency

being that the mill to be furnished will produce sixty-five per cent flour "equal to the best fifty-five per cent that Kelly & Lysle can make in their mill . . . . . . .as now constructed and operated." It is contended that those words do not indicate that Kelly & Lysle were making fifty-five per cent flour, but only an assurance that the mill to be furnished would do better than the rival mill could do. The contract might have been so worded as to have made a possible test of the two mills as a collateral fact carrying a forfeiture or reward, leaving the contract in its main features capable of being performed and of being enforced both as to the mill to be furnished and the payment to be made, irrespective of the test, and in that event the failure to obtain the means of making the comparative test would affect only the collateral feature. But in this case the plaintiff after completing the mill, could not recover the contract price until it had proved the capacity of its mill by that test, so this condition goes to the vitals of the contract itself. It is said in the evidence that the contract was written by defendant and its wording is his choosing. Not much importance should be given to that fact in an issue of this kind (though in the trial of some issues that would be a material consideration) because when the contract is made it becomes the act of both parties. But the circumstances under which it was made and the object in view should be considered in giving meaning to doubtful terms. The Kelly & Lysle mills were, at the time, in operation at Leavenworth, Kan., and the defendant's mill was to be located in Wyandotte county in that State. The object of the clause in the contract now under discussion was to obligate the plaintiff to build a better mill for defendant than that of Kelly & Lysle, one that would produce a patent flour of higher percentage of equal quality, and the clause binds the plaintiff to accomplish that end as a condition precedent to its right to payment. Can it to be supposed that the plaintiff in its right senses, or the defendant in good faith, was indifferent to the fact as to the per cent of flour

the rival mills were actually producing and rested their test upon a mere chance?    Good sense and good faith both repel that suggestion.

Appellant contends that when it became known that Kelly & Lysle had never made, and refused to make fifty-five per cent patent flour, so that the test contemplated could not be attained, it was the duty of plaintiff to have proceeded with its part of the contract and to have trusted to a recovery *quantum meruit* for its compensation.    Plaintiff was under no such obligation.    It had not contracted to build for defendant "as complete and perfect a flouring mill as far as construction, durability and easy working is concerned, as any in the United States," of the capacity of fifteen hundred barrels a day, and receive in payment therefor what a jury might say the time, labor and materials were reasonably worth, but had agreed to do so for a certain price.    It was bound by its contract, or not bound at all, and was entitled upon a fulfillment of the same on its part to the contract price.    True if it had completed the work and defendant had accepted it, plaintiff in a count on *quantum meruit*, could have recovered its value within the contract price.    But this is a suit on a contract, and the rights of the parties are to be determined by the contract alone.

This contract was so guardedly framed that the plaintiff could not by its terms receive as pay anything at all, until it had proven by the test specified that the mill had the promised capacity.    Defendant agreed to advance certain sums at stated events, but not to make payments.

There is another feature of this contract that is not to be overlooked in this connection: the $65,000 to be paid for the mill when brought up to the first test specified was not the only consideration which induced the plaintiff to enter into the contract, but if a certain higher degree of excellence and efficiency were attained, measured also by the fifty-five per

cent output of the Kelly & Lysle mill the contract price was to be $75,000 or $85,000. Now suppose when Kelly & Lysle refused to alter their mill to make the percentage flour required for the test and when defendant refused to modify the contract as to that test plaintiff had proceeded and built a mill in all respects as called for in the specifications how could it by any form of suit have recovered the price of this higher excellence which the contract promised. No count on *quantum meruit* would avail. When labor and materials are furnished by request and no price is agreed on the law will imply an agreement to pay what it is reasonably worth. But men are not restricted to that valuation in making their contracts, and particularly in the arts and sciences men often contract for a higher price in view of the skill and learning expected, than the ordinary market value of such commodities. When men contract for such prices, the law does not require them to be content with a jury's valuation. We are not now dealing with an implied contract. These parties intended to make a contract very specific in all its terms both as to the mill to be manufactured and the price therefor to be paid. The specifications were elaborate, covering every point of construction, but the defendant was not satisfied to have the mill to be judged when finished by an examination of itself, but required it to be tested by its product, and required the plaintiff to prove by that test that it was a better mill than that of Kelly & Lysle, until so proven the plaintiff's work was not up to the required standard and defendant was bound to pay nothing, and all this testing would have been perfectly feasible if the fact had been as they supposed it to be, that Kelly & Lysle made fifty-five per cent patent flour, but as that was not the fact, the contract which the parties attempted to make believing that it was a fact became impossible of performance in a very material part and wholly failed of its purpose. This is the view of the case taken by the circuit court, and its judgment is affirmed.

All concur, except *Robinson, J.*, absent.