[No. 2214]

## BESSIE MILLER, RESPONDENT, *v.* W. B. THOMPSON, APPELLANT.

[160 Pac. 775]

1. PLEADING—AMENDMENT—PRAYER.
    Under Rev. Laws, 5081, providing that where the variance is not material, a finding according to the evidence or an immediate amendment may be ordered, amendment of prayer of the complaint may be allowed at conclusion of plaintiff's case.

2. CONTRACTS —VALIDITY— IMPOSSIBILITY OF PERFORMANCE — MISTAKE.
    The contract whereby plaintiff abandons public lands, on which she has located mining claims, in consideration of the payment to her by defendant of $100 a month, till sale of 160 acres of the land, and agreement of defendant to make application for withdrawal, under the Carey Act (Act of Aug. 18, 1894, c. 301, 28 Stat. 372) of said lands and other lands, and to appropriate and develop them thereunder, the same to be sold, and a fifth of the proceeds of sale to be paid to plaintiff, is void as impossible of performance, and made under a mutual mistake; said act not allowing of sale of withdrawn land by the one withdrawing it, but only development of an irrigation system and sale of water therefrom to settlers, who make entry on the land and buy it from the state.

APPEAL from First Judicial District Court, Ormsby County; *Frank P. Langan,* Judge.

Action by Bessie Miller against W. B. Thompson. Judgment for the plaintiff, and the defendant appeals. **Reversed.**

*C. O. Whittemore* and *Platt & Sanford,* for Appellant:

The court erred in permitting the plaintiff on the day of the trial to amend her complaint without notice to the defendant or adverse party, or to his attorneys. (Rev. Laws, 5084.) Plaintiff has secured a judgment in this case without a semblance of allegation in her amended pleadings entitling her to a recovery as prayed for in the amended prayer of the amended complaint. "It is error to render judgment against a party who is made defendant by amending a complaint without giving him an opportunity to answer." (*Mears* v. *James,* 2 Nev. 342; *Weir* v. *Washoe H. & S. Co.,* 31 Nev. 528.) "A complaint cannot be altered in a material part thereof without

notice to defendant. Especially, it cannot be so altered as to set out a new and distinct cause of action." (*Keller* v. *Blasdel*, 2 Nev. 162; *Ogle* v. *Miller*, 128 Iowa, 474, 104 N. W. 502; *Linott* v. *Rowland*, 119 Cal. 452, 51 Pac. 687; *Schultz* v. *Loomis*, 40 Neb. 152, 58 N. W. 693.)

The trial court could not properly execute, assign, and adopt the findings and conclusions of law filed in the case, the findings being unsupported by the allegations of the original complaint and cause of action therein stated, and being inconsistent therewith.

The contract entered into was an unconscionable contract, and could not be enforced either at law or in equity. It pretends to call for the payment of moneys on the part of the defendant, his executors, administrators, successors and assigns forever, and without restriction or limitation as to all, and pretends likewise to permit the plaintiff to enforce the collection of moneys in monthly installments from the defendant forever, and without limitation or restriction as to time; likewise, pretends to pass this pretended right and privilege on to her successors, executors, administrators and assigns. "The insurmountable obstacle in the way of affirming the judgment, however, lies in the fact that it cannot stand the test of an application of equitable principles, but, on the contrary, is absolutely unconscionable." (*Gamble* v. *Silver Peak*, 34 Nev. 351.)

*H. C. Price,* for Respondent:

The amendment allowed to the complaint in no wise changed the issues involved, the cause of action being based upon a continuing contract, and the defendant's answer admitting that, by the terms of the writing set out in the complaint, he was to make monthly payments to plaintiff until the time of the sale of any of the lands mentioned in the contract. The statute provides for amendments to conform to the proofs. (Rev. Laws, 5080, 5081.) The law neither does nor requires an idle act, and it would be idle to require notice or a trial *de novo* when the subject-matter of the amendment has been

gone into upon the trial. (*Maionchi* v. *Nicholini*, 82 Pac. 1052; *Ramboz* v. *Stansbury*, 13 Cal. App. 649, 110 Pac. 472.)

If the appellant felt that the amendment raised issues not raised by the original pleadings, he should have asked to have the case reopened for the purpose of trying the new issues. Error cannot be predicated on the allowance of such an amendment unless this was done. (*Jackson* v. *Jackson*, 27 Pac. 957; *Ennis Brown Co.* v. *Hurst*, 82 Pac. 1060.)

It was proper to allow the prayer of the complaint to be amended to conform to the amount found to be due under the contract. Where an amendment might have been allowed to cure a variance, the judgment will not be disturbed because no formal amendment was made. (*Kuhn* v. *McKay*, 49 Pac. 473; *Johnston* v. *Farmers' Ins. Co.*, 106 Mich. 96; *French* v. *McCarthy*, 58 Pac. 154.) Amendments to pleadings to conform to evidence given without objection is permissible. In such cases they may be considered so amended. (*Westland Pub. Co.* v. *Royal*, 79 Pac. 1096; *Cureton* v. *Cureton*, 48 S. E. 162; *Tyler* v. *Bowen*, 100 N. W. 105; *Goldsmith* v. *Golland Bldg. Co.*, 81 S. W. 1112; *Hetzel* v. *Easterly*, 89 N. Y. S. 154.)

The court may grant any relief consistent with the case made and embraced within the issue when defendant has answered. (Rev. Laws, 5241.)

The contract in question was not an unconscionable contract. To make it such, there must have been either fraud, misrepresentation, accident, mistake, folly, or ignorance. "A contract is not invalid, nor is the promisor discharged, merely because it turns out difficult, unreasonable, dangerous, or burdensome." (9 Cyc. 625.) "Where the contract becomes impossible subsequent to the making of the contract, the general rule is that the promisor is not therefore discharged." (9 Cyc. 627.) "Where a party by his own contract creates a duty or charge upon himself, he is bound to make it good, notwithstanding any accident by inevitable necessity, because he might have provided against it by his contract." (9 Cyc. 728.)

By the Court, McCARRAN, J.:

This is an action on contract. It appears from the record that the plaintiff had located mining claims on the open public domain in Fish Lake Valley, in Esmeralda County, Nevada, the land embraced within the claims amounting to some 65,000 acres.

The contract entered into by the parties and on which this action is founded was in part as follows:

"That for and in consideration of the sum of one hundred dollars ($100) in hand paid by the second party to said first party, the receipt whereof is hereby acknowledged, and other valuable considerations passing from second party to first party, and the further payment to first party by second party of the sum of one hundred ($100) per month, on or before the first day of each and every month, beginning May first, 1912, during a period of time hereinafter fixed, said money to be placed to the credit of first party in the First National Bank of Los Angeles, California; and in further consideration of the terms and conditions hereinafter expressed, said first party hereby agrees to relinquish, release and abandon certain mining claims and tracts of government land situated in Fish Lake Valley, Esmeralda County, State of Nevada, approximating sixty-five thousand (65,000) acres, the abandonment of said lands having been placed in the hands of second party at the time of the signing of this agreement.

"As a further consideration for this agreement, said second party hereby agrees to make application under the law known as the 'Carey Act,' in the State of Nevada, for withdrawal of all of said lands so relinquished and abandoned by first party and her associates, and also to make application for withdrawal under said Carey Act of certain other tracts of land in said Fish Lake Valley, Esmeralda County, State of Nevada; the whole of said lands so applied for to be approximately one hundred thousand (100,000) acres more or less; and in the event such application is approved by the proper state and

United States government officials, said second party shall appropriate and develop such of said lands as he deems practical and capable of development, according to the provisions of said Carey Act; the same to be sold and disposed of to the best ability of the parties hereto; and said first party hereby agrees to use her best endeavors to assist second party in the sale of said lands and the promotion of the enterprise herein provided for, she to receive no commission on sales made by her, it being hereby agreed that second party shall be allowed such agents' commissions as he deems necessary and advisable to be paid in making sales of said lands, no part of such commissions to be paid by first party.

"It is expressly provided that the second party shall have the full and complete control and management of said business and the enterprise provided for herein and the right to make such disposition of any and all of said lands as he deems best, provided, however, that he shall pay to first party one-eighth of any and all money received from sales of land procured under this agreement, or its production, and that a monthly accounting shall be rendered by second party to first party of all sales made, and the money coming to first party under said accounting shall be placed monthly to her credit in the First National Bank of Los Angeles, California.

"It is further agreed that the payment of one hundred dollars ($100) per month by second party to first party, hereinbefore provided for, shall cease at the time of the sale of any of the aforesaid lands amounting to one hundred sixty acres (160).    *    *    *

"It is further agreed that all of the terms and conditions herein expressed shall be binding upon both of the parties hereto and upon their and each of their heirs, executors, administrators and assigns."

1. Two questions are presented in the case at bar, one having to do with the right of the plaintiff in the court below to amend the prayer of her complaint at the conclusion of the presentation of her case and before the

judgment was entered. The other, which we deem the more serious, is that the evidence is insufficient to warrant the judgment and decree of the trial court.

In so far as the question of the right of the court to admit of the amendment to the prayer of the complaint is concerned, the action of the court in this respect comes under the rule, which we believe well supported by authority, that a pleading may be amended so long as the facts alleged as the basis of the recovery remain the same, so that a new cause of action is not interposed; and under this rule a pleading may be amended by amending the prayer so as to enlarge or modify the extent of the relief sought. (*Johnson* v. *White Mountain Creamery Assn.*, 68 N. H. 437, 36 Atl. 13, 73 Am. St. Rep. 610; *Rettig* v. *Newman,* 99 Ind. 424; *Western Union Telegraph Co.* v. *Brown,* 62 Tex. 536; *Hogueland* v. *Arts,* 113 Iowa, 634, 85 N. W. 818.)

The section of our code applicable to the matter (Rev. Laws, 5081) provides:

"Where the variance is not material, as provided in the next preceding section, the court may direct the fact to be found according to the evidence, or it may order an immediate amendment, without costs."

In the case of *Buckley* v. *Buckley,* 12 Nev. 423, this court held in substance that, when the facts alleged in a supplemental pleading occurred after the original pleadings were filed and were consistent with and in aid of the original pleadings and did not bring into the case any new cause of action or any controversy that was not in fact included in the issue originally made, supplemental pleadings should be allowed if asked for, so as to protect the rights of the respective parties.

The basis of the controversy in the matter at bar was the contract, which was of a continuing nature. The amount due on the contract at the time of the filing of the complaint was, by reason of the very nature of the contract itself, less than that which would have accumulated by reason thereof at the time of the rendition of judgment. It was not a new cause of action nor a cause

of action based upon a new or distinct ground. It was the same cause of action based upon the same instrument.

In the case of *Maionchi* v. *Nicholini*, 1 Cal. App. 690, 82 Pac. 1052, the Supreme Court of California, under code provision quite similar to ours, held that the court might direct a fact to be found according to the evidence, and may order an amendment to the original pleading sufficient to cure an immediate variance, and which would make the pleading conform to the proof; further, that this might be done without serving a copy upon the adverse party or his attorney, providing, however, that the adverse party was not actually misled by such amendment to his prejudice.

This same principle was discussed in the case of *Ennis Brown Co.* v. *Hurst*, 1 Cal. App. 752, in the same volume of the Pacific Reporter at page 1059, wherein the court held that it was proper for the trial court to permit of an amendment to the complaint after the evidence had been closed and the cause had been submitted and taken under advisement and before decision; and to the same effect is the case of *Lee* v. *Murphy*, 119 Cal. 364, 51 Pac. 549, 955.

In the case of *Ramboz* v. *Stansbury*, 13 Cal. App. 649, 110 Pac. 472, it was held that, when in the trial of a cause evidence was offered as to subject-matter of an amendment subsequently made to the complaint, the court did not abuse its discretion in permitting such amendment where such would conform to the proof.

In the case of *French* v. *McCarthy*, 125 Cal. 508, 58 Pac. 154, the Supreme Court of California, having under consideration a matter of contract, held that, where the defendant appears and answers in an action on a contract, the terms of which are set forth in the complaint, and there is a want of conformity between the prayer of the complaint and the facts set forth, the court is authorized to permit an amendment at the trial by inserting a larger sum in the prayer.

The case of *French* v. *McCarthy, supra,* presented a problem affecting an amendment to the prayer of a complaint in an action where a contract continuing in its

nature was involved, and where, after the action had been commenced, additional payments were made on the contract so as to involve a sum in excess of that due and owing on the contract at the time of the commencement of the action.

In the case of *Finnegan* v. *Ulmer*, 31 Nev. 523, 104 Pac. 17, this court, in quoting from its former decision in the case of *McCausland* v. *Ralston*, 12 Nev. 202, 28 Am. Rep. 781, affirmed a rule which we think applicable to the case at bar, wherein it said:

"Courts in allowing pleadings to be amended are necessarily clothed with discretionary powers which cannot, owing to the varying circumstances of each particular case, be governed by any general rule. The vital question is whether the court has grossly abused its discretion in this respect, or whether, by the allowance of the amendments, manifest injustice has been done to appellant."

The amendment allowed by the court, and which was to the prayer of the complaint, introduced no new allegations, made no additional parties, did not complicate the suit, nor increase the expense of litigation, nor did it make new issues of fact or incumber the record. Early authorities on the subject of pleading addressed themselves to the subject thus:

"If the bill be found defective in its prayer for relief, or in proper parties, or in the omission or mistake of some fact or circumstance connected with the substance of the case, but not forming the substance itself, the amendment is usually granted. But the substance of the bill must contain ground for relief." (*Lyon* v. *Tallmadge*, 1 Johns. Ch. N. Y. 184.)

2. Does the evidence support the judgment and decree of the trial court? It is the contention of appellant here that the contract in question was one which by its very terms made performance impossible, and that the contract was unconscionable. Moreover, it is contended that the contract was void, inasmuch as there was a want of consideration.

We may say at the outset that the conditions and

terms imposed by the contract are, if not rare, at least unusual and novel. The plaintiff, respondent here, had located a vast tract of the open public domain by means of mining locations. These locations, being made under the authority of a federal statute applicable to the subject and pursuant to state laws in conformity therewith, contemplated at the very outset the mineralized character of the land covered by the locations. Indeed, it would be difficult for one to even imagine that respondent would assert that these claims were on other than mineralized domain, for the mere assertion of such a contention would of itself defeat the right of respondent to locate the territory under the mining law. The validity of each claim located by respondent depended upon the discovery of mineral. (*Overman S. M. Co.* v. *Corcoran,* 15 Nev. 149; *Golden* v. *Murphy,* 31 Nev. 395, 103 Pac. 394, 105 Pac. 99.)

The act of making a location and the maintenance of the same upon the public lands looks for its validity to the assertion of the locator that the same is mineralized, and that the discovery of mineral has been actually made. (*Golden* v. *Murphy, supra.*)

For the maker of a mining location to declare that the territory embraced within the lands of his location was nonmineral in character would be the equivalent to declaring his location to be null and void, and his right to possession, use, or occupancy of the public domain under the mining laws of the land would automatically cease.

The contract here in question was one which to our mind indicates a joint adventure entered into by the parties for mutual gain, and this to be acquired from the sale and disposition for agricultural purposes of the very lands to which respondent here claimed title under her declaration that she held a valid location based upon the discovery of mineral.

The agreement entered into provides that:

"As a further consideration for this agreement, said second party hereby agrees to make application under the law known as the 'Carey Act,' in the State of Nevada,

for withdrawal of all of said lands so relinquished and abandoned by first party and her associates;   *   *   * and in the event such application is approved by the proper state and United States government officials, said second party shall appropriate and develop such of said lands as he deems practical and capable of development, according to the provisions of said Carey Act; the same to be sold and disposed of to the best ability of the parties hereto."

The contract further provided that the appellant here, the second party to the instrument, should pay to the first party one-eighth of any and all money received from sales of land procured under the agreement.

It might be well at this juncture to note that the act of Congress known as the Carey Act (Act Aug. 18, 1894, c. 301, 28 Stat. 372), and that under which the parties here were to carry out the provisions of their contract, is one enacted "to aid the public-land states in the reclamation of the desert lands therein, and the settlement, cultivation and sale thereof in small tracts to actual settlers." (28 Stat. L. 372, 422, sec. 4.) The act was passed that its provisions might be in furtherance of a former act of Congress entitled "An act to provide for the sale of desert land in certain states and territories." (Act March 3, 1877, c. 107, 19 Stat. 377, U. S. Comp. St. 1913, secs. 4674–4676.) The act, among other things, provides that the land may be withdrawn from the public domain and segregated to the state under rules and regulations prescribed by the secretary of the interior. The law itself, as well as the regulations prescribed by the secretary of the interior, provide, among other things, that an application for the withdrawal of the lands from entry and their segregation under the act shall be accompanied by an affidavit, based upon personal examination, that the lands sought to be withdrawn are desert in character as contemplated by the Carey Act, and are nonmineral. Hence we have here a rather anomalous situation presented by the contract in question, in which the respondent, plaintiff in the court

below, set up as a valuable consideration the abandonment of a right to the control and possession of public domain under the assertion that the same was mineral in character. This abandonment, however, the sole and only consideration on the part of respondent, was made in futherance of a scheme in which, according to the terms of the contract, she was jointly interested, the success of which scheme depended upon the nonmineralized character of the very land which she claimed to relinquish. If the public domain over which respondent's mining claims were located was nonmineral, then she had no right or claim or title, under the mining laws, to the land embraced within her claims. If the territory covered by the mining claims was mineralized in character, it was impossible to carry out the scheme contemplated by the contract, in which scheme she was jointly interested and by the success of which alone she could claim anything from appellant herein. If the land in question was nonmineral, respondent had no right to control or possession of the territory covered by the claims; hence she conveyed nothing of value as a consideration. If the land was mineral in character, that of itself *ipso facto* defeated the scheme and made the thing sought to be carried out under the contract impossible; hence performance by the appellant was impossible.

That the contract is void as being impossible of complete execution is made manifest when we view it from another angle. The contract provides for the payment of $100 per month to respondent by appellant; said payments to continue during a period of time as fixed by a specific section of the contract which reads as follows:

"It is further agreed that the payment of $100 per month by said second party to first party, hereinbefore provided for, shall cease at the time of the sale of any of the aforesaid lands amounting to 160 acres."

The contract, among other things, provides:

"The whole of said lands so applied for to be approximately 100,000 acres more or less; and in the event such

application is approved by the proper state and United States government officials, said second party shall appropriate and develop such of said lands as he deems practical and capable of development, according to the provisions of said Carey Act, the same to be sold and disposed of to the best ability of the parties hereto."

By the act of Congress known as the Carey Act, no land is acquired by any person, company, or corporation, unless (if a natural person) he should become an entryman, in which case 160 acres would be the maximum acreage such entryman might acquire. The Carey Act by its several provisions contemplates the establishment and perfection of reclamation projects, the same to supply water for the irrigation of a given tract of land, and, when completed, the person, whether natural or artificial, conducting the same, derives his or its profits from the sale of the water rights to actual settlers on the lands covered by the reclamation project. The act provides for temporary withdrawal of the public lands from entry. An application for a temporary withdrawal of lands under the provisions of the act means that the applicant proposes to irrigate the lands requested to be withdrawn from public entry and desires time to make the necessary surveys, maps, plats, determinations, and specifications to comply with the government requirements. The object of the temporary withdrawal is to protect the applicant from interference by persons attempting to acquire lands within the project other than through the procedure established for Carey Act projects. One who seeks to carry out a reclamation project under the Carey Act must file with the state engineer of the State of Nevada an application for a water right commensurate to the acreage sought to be reclaimed. (Rev. Laws, 3068.) The effect of the temporary withdrawal is to withhold the lands for one year from entry under public-land laws.

One who seeks to perfect a project under the Carey Act, as we read the law, has nothing whatever to do with the sale or disposal of the land covered by the project.

When the irrigation system is in condition to deliver water to settlers, the price at which water rights will be sold to such settlers having been fixed by contract between the State Carey Act Commission and the party in charge of the project (Rev. Laws, 3071), the lands are thrown open for entry and allotment of not exceeding 160 acres to each entryman. The payments for the land are made by the entryman to the state, and the patent issued for the land is from the state to the entryman. The right to the use of the water, and not the land, is sold by the party perfecting the project to the actual settler. (Stats. 1911, p. 84; 28 Stat. L. 372–422.)

A contract to do a thing which cannot be performed without a violation of the law is void, whether the parties knew the law or not. (6 R. C. L. 694.)

The contract here in question assumes the carrying out of a scheme made impossible by the very law under which the scheme was to be perfected. If we read the contract correctly, it assumes the right of the parties to sell and dispose of the land and acquire a profit from such sale and disposition. The right of sale is expressly reserved by the federal statute to a third party, namely, the state. If the contract had contemplated the development of an irrigation system and the sale of the water therefrom to settlers upon the public domain under the system, the contract would have assumed the performance of that which under the law was within the power of the contracting parties.

It may, we think, be safely said that the contract here in question assumed the existence of an essential fact, namely, the right of one or both of the parties to sell and dispose of the lands under the law known as the Carey Act. This was a false assumption, and a contract based upon such has been said to be one where there is no meeting of the minds in reality, and hence no contract. (*Nordyke & Marmon Co.* v. *Kehlor,* 155 Mo. 643, 56 S. W. 287, 78 Am. St. Rep. 600.)

The obligation imposed upon the appellant herein to

pay to the respondent the sum of money specified until the first sale of 160 acres had been accomplished contemplated a termination of the obligation by an incident made impossible by law. If the contract had provided that the sum specified should be paid to respondent each month until the first entryman had filed upon the land under the project, or until the first entryman, having filed on 160 acres under the project, had assumed the obligation of paying for the water for 160 acres, or until the first entryman had made payment to the state, or until the first entryman had paid for water for the first 160 acres, then, under either of these, a condition might be presented capable of accomplishment by one or both of the parties. The contract here in question was subject to implied conditions incapable of performance by respondent or by the joint efforts of the parties, and hence unenforceable. (*Dexter* v. *Norton*, 47 N. Y. 62, 7 Am. Rep. 415; *Booth* v. *Spuyten Duyvil Rolling Mill Co.*, 60 N. Y. 491.) This condition arose not by subsequent acts or conditions, but was embodied into the very contract itself at the time of its making, inasmuch as the terms of the contract were made impossible by operation of the law which the contract itself sought to put in motion.

It will not be assumed from the language of the contract that it was the intention of the parties at the time of making the instrument that the appellant was to pay to respondent a sum of money each month indeterminate as to time. It is rather to be concluded that the intention of the parties was to terminate the payments on the transpiring of an event, to wit, "at the time of the sale of any of the aforesaid lands amounting to 160 acres."

Through an ignorance of the law, the parties may have believed, at the time of making this contract, that such an act was possible. But inasmuch as the sale and disposition of the land was not a matter within the control or regulation of either of the parties, but rather a matter solely within the power of a third party—the state—the conditions under which the respondent here might have

carried out the obligations imposed by the contract were not within his control. It would appear here as though the agreement was founded upon a false conception as to the law under which its terms were to be carried out and upon the operation of which law performance was contingent. This precludes the idea of a meeting of the minds. A contract or agreement founded on a false conception as to a matter or thing then existent is null in so far as it may be operative against the party who misconceives. (*Frevall* v. *Fitch,* 5 Whart. Pa. 325, 34 Am. Dec. 558. )

It has been said that where a contract was made under a mistaken idea or belief that future legislation would be enacted, which legislation was never enacted, and the failure for the enactment of the same was not imputable to either of the parties, the contract is not enforceable. (6 R. C. L. 620.) If this rule is applicable to legislation not yet enacted, it is equally applicable to laws in existence at the time of the making of the contract, the effect of which makes the conditions of the contract legally impossible of accomplishment.

In the case of *Miles* v. *Stevens*, 3 Pa. 21, 45 Am. Dec. 621, the Supreme Court of Pennsylvania gave expression to that which we find to be a general rule, namely, that if the agreement in question was made under a mistaken impression that facts essential to the contract did exist or would afterwards exist, and if the contracting parties were prevented from performing by causes over which the parties had no control, the contract is unenforceable. There the court said:

"We perceive no distinction either in principle or authority, where the parties contract, either with a view to existing facts, or facts merely in contemplation between the parties, dependent on future events or contingencies. In either case, when the basis of the contract fails without the assent of the parties, to attempt to enforce the agreement is inequitable."

The principal thing in the minds of the contracting

parties, as disclosed from the very language of the contract itself, was the sale and disposition of lands which at the time of the making of the contract were of the open public domain of the United States. It was the accomplishment of the ultimate purpose of the contracting parties, namely, the sale of the land, which was to terminate the obligation imposed upon appellant here. They were mistaken when they assumed that either of the parties might sell or dispose of the public domain under the law known as the Carey Act. They were mistaken when they assumed that the Carey Act, the law which their joint venture was to set in motion, permitted the sale of the land by the individuals, associations, or corporations at whose instance the land would be withdrawn from public entry. In our judgment we assert a correct rule of law, fairly applicable to the matter at bar, when we say that where certain facts assumed by both parties to a contract are the basis of the contract, and it subsequently appears that such facts do not exist, or by a law then existent are made impossible or inoperative, the contract is void. (*Fink* v. *Smith*, 170 Pa. 124, 32 Atl. 566, 50 Am. St. Rep. 750.)

In 6 Ruling Case Law, at page 621, we find a statement which we believe well supported by authority, to the effect that if an agreement is induced by a mistake common to both parties, without which mistake the agreement would not have been made, and the mistake was in respect to the subject-matter of the contract, the agreement is inoperative and void. "This rule," says the authority, "which has been adopted as a part of the common law, is based upon the idea that in such cases no contract has been consummated, that the minds of the parties have never met in respect to the real subject-matter of the contract. It is not a case of a mere failure of consideration, for that implies the existence of a contract, while a mutual mistake prevents the existence of one."

Where parties assume to contract, and there is a mistake

as to the existence of a subject-matter, it is, we think, a correct statement of the law that under such conditions there is no contract because of the want of mutual assent necessary to create one.

We quote from 6 Ruling Case Law, p. 621, that which we deem applicable to the matter at bar, to the following effect:

"If by mutual mistake a contract is founded upon a condition impossible of performance because of the assumption of the existence of a fact which cannot exist, and its adoption by both parties as the sole standard by which to test the performance of the condition, the contract cannot be enforced, and it is immaterial who furnished the information upon which the condition is predicated, or that the person pleading the mistake had the means of discovering it, or by care and diligence might have avoided it." (*Nordyke & Marmon Co.* v. *Kehlor, supra.*)

It is unnecessary for us to dwell upon the motion to strike or the motion to dismiss the appeal, inasmuch as the matter touched upon in our decision and by reason of which we conclude that a reversal must ensue is a matter appearing upon the face of the judgment roll. The pleadings in the case are properly a part of the judgment roll, and the contract in question being an essential part of the pleadings in this case, it was unnecessary for us to go further than to determine the fact as to whether the judgment was supported by the pleadings. Our conclusion in the matter is arrived at from the judgment roll alone. Hence it was unnecessary for us to consider any of the phases of the appeal that might have been affected by the motion to strike. The motion to dismiss the appeal was not well taken as against the appeal from the judgment alone, inasmuch as the time for such an appeal had not expired.

The judgment is reversed.

It is so ordered.

NORCROSS, C. J.: I concur.

COLEMAN, J., concurring:

While I concur in the order of reversal, I cannot agree with the interpretation put upon the contract in question by the court, as expressed in the following language:

"For the maker of a mining location to declare that the territory embraced within the lands of his location was nonmineral in character would be equivalent to declaring his location to be null and void, and his right to possession, use, or occupancy of the public domain under the laws of the land would automatically cease."

In my opinion, there is not one word in the contract to justify this construction. Whether the mining claims mentioned in the contract were located as lode mining claims or as placer claims, for oil or other minerals, does not appear. It is a well-known fact that there have been many thousands of acres of land located and patented as mineral or nonmineral that might have been, with propriety, located and patented as of the other class. In some instances land has been held to be mineral by the courts and agricultural by the land department, both tribunals acting upon substantially the same evidence. A striking example of this was brought to our attention in the recent case of *Earl* v. *Morrison*, 39 Nev. 120, 154 Pac. 75. Suppose in that case the locator under the scrip (who finally prevailed), realizing the delay, enormous expense, and other inconveniences incident to prolonged litigation both in the courts and before the land department, had entered into an agreement with the placer locators, whereby it was agreed that they should cancel their scrip locations and permit the placer locators to proceed to patent without contest, upon the condition that the placer locators might work the land for mineral, and that the scrip locators might cultivate it, each so operating as not to interfere with the other, and that after all the mineral was exhausted the land should be conveyed in fee to the scrip locators, would any one say that there would be no consideration for the canceling of the scrip location? I think not.

Suppose Jones and associates should locate a tract of

land as a placer claim for the purpose of mining for oil. The land has all the indications that oil can be found by prospecting. They are all poor men. Shortly after the oil locations are made, Brown and associates, men of wealth, come along and say to Jones and associates:

"The land which you have located for oil will grow fine alfalfa, and there is a large stream of water near by with which it can be irrigated. We are going to town and enter the land under the Desert Act and appropriate the water for irrigation purposes. Now, we do not care for the oil, and, if you will abandon your locations for oil, we will patent the land under the Desert Act and enter into a contract with you that you may go upon the land and prospect for oil as soon as we get our patent, and that your operations shall be without hindrance from us."

Jones and associates, having no money with which to litigate, and knowing that some of the best agricultural land in the world produces the highest quality of oil, accept the proposition, abandon the placer location, and Brown and associates procure their patent. Jones and associates go upon the premises, put down a well, and get oil. Brown and associates eject them. Would any one say that Jones and associates would have no remedy? What is the difference between the supposed case and the one at bar?

We will suppose another case. John Smith, a poor prospector, with barely sufficient resources to maintain his existence while developing his property, locates ground as a placer mining claim, which has all the indications to justify its location as such, and ninety days thereafter opens up within its boundaries a true fissure vein of high-grade gold ore. Three days after opening up this fissure, John Doe, a wealthy man, goes upon the property and locates the fissure vein in his own name. John Doe goes to John Smith and says:

"The vein which I have located on your placer was a 'known vein' at the time you located your placer claim, though you may not have known of its existence. It having been a known vein, you cannot hold it under your

placer location; but I do not want a lawsuit with you. Now, if you will abandon your placer location so that I can perfect patent to my lode location without litigation, I will give you an undivided one-third interest in my lode claim."

Smith, being a poor man, accepts the proposition, and a written agreement is entered into accordingly, whereupon the placer location is abandoned and a relocation of the lode claim, so as to take in all the ground allowed by law, is made by Doe, and the claim is patented in his name. But thereafter he refuses to acknowledge any rights in John Smith because he had abandoned his placer location to enable Doe to acquire title to a valuable lode claim. Is it not clear that a court of equity would compel John Doe to do equity? We think it is. So far as appears in the record, the case at bar is not materially different from either of the supposed cases.

I cannot agree with the view expressed that the agreement entered into between the parties indicates a joint adventure. A joint adventure is nothing more nor less than a partnership limited to a single transaction. In other words, to constitute a joint adventure there must enter into the undertaking the elements of a partnership, such as a sharing of the losses and of the profits. There is nothing of that kind in this case. While respondent was to assist in promoting the project, she was not to participate in the profits. She was to receive a monthly payment which was not made contingent upon there being profits.

As to the position taken in the opinion of the court, that the contract is void because it was impossible to complete performance, I need only to say that there is no doubt but that the contract is incapable of performance according to its letter, for the reason that no land withdrawn pursuant to the terms of the Carey Act can be sold by the state, and not for more than $1 per acre. When we consider this fact, and the further fact that in projects of this character the law permits the promoter

to sell to the purchasers of land a perpetual right to water to be appropriated for use upon the land, we are inevitably forced to the conclusion that it was the intention of the parties that the right to the payment in question should turn, not upon the sale of 160 acres of land, but upon the sale of a water right for 160 acres of land.

If we were to undertake to ascertain the real intention of the parties to the contract, I think we might take into consideration the subject-matter of the contract, the existing federal and state statutes, the situation of the parties at the time of its execution, and all other surrounding facts and circumstances. If this view is correct, the question arises as to whether or not the contract is capable of reformation so as to be made to read in accordance with the intention of the parties.

*Per Curiam:*

Petition for rehearing denied.

