EDWIN J. BRUNNER v. STIX, BAER & FULLER COMPANY, a Corporation. —No. 37382.—181 S. W. (2d) 643.

Court en Banc, June 5, 1944.

Rehearing Denied, July 3, 1944.

1226

*Ben L. Shifrin, Herman Willer, James E. Garstang* and *Harold R. Small* for appellant; *Carter & Small* and *Taylor, Mayer, Shifrin & Willer* of counsel.

1228

*Jesse W. Barrett* and *Joseph J. Howard* for respondent.

1230

LEEDY, J.—We adhere to the views expressed in, and re-adopt' that portion of the opinion written by Bohling, C., in Division II, which later became the opinion of the court en banc on the former submission of this cause en banc, all as indicated by the quoted matter following:

"The action arises out of an alleged contract. Defendant operates a large department store in St. Louis. Plaintiff's petition alleged that he 'devised a plan for an employee's sales campaign and contest,' and in March, 1930, 'offered said plan for sale' ▮ to defendant 'as a means of increasing' defendant's business; 'that said plan contemplated the promotion of a prize contest among the employees of defendant corporation to secure new customers and new charge accounts, and it set forth the means and methods' for conducting said contest and campaign; that plaintiff 'outlined said plan' to Leo C. Fuller, one of the principal officers of defendant, and 'at Mr. Fuller's request,' explained said plan to other officers and agents of defendant; that 'defendant corporation agreed to use said plan and to compensate plaintiff therefor in whatever amount should be found to be the reasonable value thereof after said plan had first been tested and tried.' The petition also charged that defendant 'put plaintiff's plan into effect' to defendant's great advantage; that thereafter 'plaintiff requested defendant corporation, in accordance with its said contract, to compensate him for said plan and for his services rendered in connection therewith, but that said defendant corporation, its officers and agents, have refused to pay said plaintiff anything whatever'; alleged the reasonable value of said plan to be $96,000, and prayed judgment accordingly.

"Defendant's answer was a general denial.

"The issue tendered appears to be contract vel non.

▮ "Defendant takes the position no cause of action was pleaded on the ground the understanding, according to plaintiff, was that his plan would be tested and tried and after such test and trial the parties would agree upon a reasonable compensation to plaintiff; i. e., an agreement to negotiate an agreement is insufficient to sustain a recovery. We do not so view the petition. True, contracts should be definite and certain and generally a definite price or compensation is an essential element of a binding contract. But the rule with respect to contracts executed except for payment is that there arises an implied promise to make reasonable payment. Levitt v. Miller, 64

Mo. App. 147, 150; Swift v. Johnson, 175 Mo. App. 660, 666, 158 S. W. 96, 98 [4]; Clay v. Algire (Mo. App.), 9 S. W. 2d 870, 872 [5]. See Nordyke & Morman Co. v. Kehlor, 155 Mo. 643, 658, 56 S. W. 287, 291, 78 Am. St. Rep. 600, 610; Liggett & Meyer Tob. Co. v. Meyer, 101 Ind. App. 420, 431 [2, 3], 194 N. E. 206, 210[4]. Plaintiff's petition charged that defendant agreed to use plaintiff's plan and to pay 'whatever amount should be found to be the reasonable value thereof after said plan had first been tested and tried'; that defendant used plaintiff's plan and thereafter refused to make any payment whatever. Plaintiff's case involves a reasonable compensation only and is upon a contract to pay a reasonable compensation. The petition is sufficient for the stated purpose. Joy v. St. Louis, 138 U. S. 1, 43, 34 L. Ed. 843, 856, 11 Sup. Ct. 243, 255, (involving 'reasonable regulations and terms as may be agreed upon' and 'for such fair and equitable compensation* as may be agreed upon*'); Corthell v. Summit Thread Co., 132 Me. 94, 167 Atl. 79, 92 A. L. R. 1391, 1396; 17 C. J. S. p. 821, Sec. 363; 12 Am. Jur. p. 561, Sec. 70, p. 878, Sec. 324; 1 Williston on Contracts, p. 115, Sec. 41. What we have said rules a like attack against the evidence.

 "We find much in the briefs concerning the law of copyright; the property or lack of property, common law and statutory, one may have in literary works, piracy, etc. Copyright embraces the right of one to make copies of a literary work, and to publish and vend the same to the exclusion of others. There is a distinction between the property of a creator in his idea and his property in the manuscript setting forth his idea, (property in a personal chattel), as well as his right to prevent others from reproducing his expression of his idea—the present-day common law right to make original publication and statutory authority to multiply copies for a limited time to the exclusion of others. Common law and statutory copyright (17 U. S. C. A. Secs. 1-63) are monopolistic in nature. Generally speaking, one's common-law monopolistic right to publish a literary work ceases upon publication and statutory copyright continues the monopolistic right to multiply copies thereafter for a limited period. Fashion Orig. Guild v. Federal Trade Com'n., 114 F. 2d 80, 83 [2, 3]; Kurfiss v. Cowherd, 233 Mo. App. 397, 406, 408, 121 S. W. 2d 282 286 [3, 9, 10]. The two do not exist concurrently. Copyright protects the expression of an idea. It does not protect the idea. Ansehl v. Puritan Pharmaceutical Co., 61 F. 2d 131, 137 [7]; Affiliated Enterprises v. Gantz, 86 F. 2d 597, 598 [1]. Plaintiff's petition did not proceed on the theory defendant failed to pay for the transfer of any claimed common-law or statutory right in a literary work. It involved contract law, charging defendant breached a contract to pay for the use of plaintiff's plan. Plaintiff alleged he had 'devised a plan,' reduced certain ideas into a comprehensive scheme, setting 'forth the means and method,' giving information, for the conduct of an

employee's sales campaign and contest, which defendant expressly agreed to use and pay for, and did use but did not pay for. Individuals produce results through physical and mental efforts. Executory contracts for the rendition of such services are valid. How J. Ryan & Associates v. Century Brewing Co., 185 Wash. 600, 55 Pac. 2d 1053, 104 A. L. R. 1353. A distinction exists between physical and mental efforts in that the former produces corporeal and the latter incorporeal results. Property rights in a corporeal thing are not lost with the disclosure or exhibition of the physical device. The owner may follow a chattel and assert his property therein. An idea, sometimes likened to ferae naturae, does not have physical attributes and escapes the creator's dominion when uttered. It may not ordinarily be followed after disclosure. Yet, as long as the creator of an idea refuses to disclose, it, he exercises dominion over it. The utterance of his idea by a creator or the expiration of his copyright or patent operates merely to destroy his monopolistic right in the copyrighted work or patented invention; but the creative value of the idea imparted by the literary work or by the invention is not destroyed. The case does not pivot on an unauthorized use of an asserted property right, common law or statutory, in a disclosed idea, but on a contract to pay for the authorized use of a disclosed idea. Plaintiff was under no legal obligation to make his plan known to defendant. He disclosed it in consideration of a promise given and received as the equivalent in value for its disclosure. Defendant's cases recognize, we think the disclosure of a new and useful idea, or one thought to be useful, may be protected by contract.

"Defendant states Haskins v. Ryan (1906), 71 N. J. Eq. 575, 64 Atl. 436, 75 N. J. Eq. 623, 73 Atl. 1118; (1908), 75 N. J. Eq. 330, 78 Atl. 566, is a leading case. It was a suit in equity for a discovery and accounting, Haskins charging, briefly stated, that he devised and submitted a scheme for combining the white lead industries, not including the National Lead Company, to Ryan, who expressed a willingness to join therein, provided investigation confirmed Haskins' statements; that Ryan availed himself of the information and independent of Haskins organized a company and secured control of such industries, making large profits. The bill was dismissed, but the court said (64 Atl. 1. c. 438) ; 'Now, it has never, in the absence of a contract or statute, been held, so far as I am aware, that mere ideas are capable of legal ownership and protection. . . . I am therefore of opinion that complainant has no property right in his plan regarded as an idea. Having no property right, he has no right to an account.' And (78 Atl. 1. c. 567) : 'Undoubtedly ideas, if valuable or even thought to be valuable (supposing them to be such as the law approves of), may be the subject of bargain and sale. They may be the subject of contract, but they must be protected by contract. Their originator cannot give them out and then sue for an indefinite share of profits

which someone else may make out of a venture in which he seeks to embody or utilize them.'

"Masline v. New York, N. H. & H. R. Co. (1921), 95 Conn. 702, 112 Atl. 639, 640 [1, 3], is a frequently cited case where recovery is denied. It was an action on a contract to recover five per centum of the receipts accruing to defendant by reason of its use of plaintiff's idea to sell space for advertisements on its railway stations, rights-of-way, cars and fences. The court considered that the contract lacked a consideration; that there was nothing new, novel, original or valuable in the abstract proposition 'selling advertising space,' and that plaintiff's idea was well and commonly known and not original. It said: 'An idea may undoubtedly be protected by contract. Haskins v. Ryan, 75 N. J. Eq. 332, 78 Atl. 566. But it must be plaintiff's idea. . . . To furnish a consideration for a contract of this kind the plaintiff must upon his proposition either offer a new idea to be protected by the contract, or, if the idea is common, he must present a specific matter of his own for the use and application by the defendant of the common idea. Stein v. Morris, 120 Va. 390, 91 S. E. 177; Bristol v. Equitable L. Assur. Soc., 52 Hun, 161, 5 N. Y. Supp. 131.' Our reading of the Stein and Bristol cases fails to disclose an expressed contract; for instance in Bristol v. Equitable L. Assur. Soc., 132 N. Y. 264, 30 N. E. 506, 507, (affirming 52 Hun, 161, 5 N. Y. Supp. 131): 'Plaintiff communicated his system without marketing it.' Generally, the adequacy of a consideration considered by the party at the time of contracting as the equivalent of the promise is not inquired into. 12 Am. Jur. p. 614, Sec. 122.

"Burwell v. Baltimore & O. R. Co. (1928), 31 Ohio App. 22, 164 N. E. 434 [1], considered the information a mere supposition, cited Masline v. New York, N. H. & H. R. Co., and denied recovery but said: 'Contracts to furnish information may be valid and enforceable.'

"Soule v. Bon Ami Co. (1922), 201 App. Div. 794, 195 N. Y. Supp. 574, 575 [1, 2]; affirmed (1923), 235 N. Y. 609, 139 N. E. 754, 755, wherein plaintiff sued on a contract to recover one-half of the alleged increased profits accruing to defendant from defendant's use of plaintiff's idea that defendant could raise the price of Bon Ami to the retail stores and increase its profits without affecting the volume of the sales, is frequently cited to the holding (by a three to two vote) quoted infra, of the New York Supreme Court, wherein Masline v. New York, N. H. & H. R. Co., supra, is cited, quoted and relied upon viz.: 'The plaintiff, according to his complaint, was to impart to defendant valuable information, and this information was to suggest a way or method of increasing the defendant's profits. When this information was furnished to the defendant, it consisted merely of the suggestion that the defendant should increase its price upon its product, and thereby an increase in profits would result. . . . The central

idea here, however, was an obvious one. . . . This was not new, it was not original, and I am at a loss to understand how it could be deemed valuable. . . . The plaintiff did not prove the contract was supported by a valuable consideration, and the complaint should have been dismissed.' But, upon appeal, the majority of the New York Court of Appeals did not adopt this view of the Appellate Division of the Supreme Court. Hogan and McLaughlin, JJ., did concur in toto; but Cardozo, Pound, Crane and Andrews, JJ., concurred 'on the ground plaintiff failed to prove profits resulted from change of plans.' See comment on Soule v. Bon Ami Company in the later opinion by Crane, J., in Keller v. American Chain Co., infra, in which the entire court concurred, including Cardozo, C. J., and Pound, J.

"Moore v. Ford Motor Co. was in equity for an injunction, accounting and damages, plaintiff alleging he originated a 'thrift purchase plan' for the sale of automobiles, submitted his plan to defendant and restricted defendant's use to an examination for the purpose of determining whether to negotiate for its purchase; that defendant wrongfully appropriated the plan and copied plaintiff's forms of expression; and plaintiff, upon learning thereof, immediately claimed piracy. The case proceeds on the theory of property rights and an implied contract, rather than an expressed contract as in the instant case. The district court dismissed plaintiff's bill (1928), 28 Fed. 2d 529, observing, among other things, 'It is frequently not merely the idea but it is the ability to carry it out successfully, that produces results. . . . I think it would be going further than the courts have gone or should go, in the absence of some agreement, or a fiduciary relationship, to hold that, where one imparts a mere idea to another, and that one acts upon it and profits thereby, he is liable for the profits derived. . . . and, of course, no one need disclose his idea, except upon his terms.' l. c. 538. But the Circuit Court of Appeals (1930, 43 Fed. 2d 685), in affirming the decree nisi, did not follow the reasoning advanced. The court said, in part: '. . . we may assume, without the necessity of decision, that the originator of a novel method of merchandizing acquires a right akin to that recognized in the law in respect to a trade secret. [Citing cases.] Concededly, such a right, if it exists, may be lost by an unrestricted publication of the idea.' l. c. 686 [1]. And, with respect to plaintiff's restricted communication of the idea: '. . . it does not mean that defendant was freed from any obligation not to appropriate it without plaintiff's consent. [Citing cases.]' l. c. 687 [2]. And, concerning the main dispute, whether defendant copied plaintiff's idea: 'It is conceivable that the idea came from plaintiff's letter, if Ryan and Davis [defendant's sales manager and assistant sales manager] are lying. But it is equally conceivable that they obtained the idea elsewhere, as they say they did.' The decree nisi was thereupon affirmed, the gist of the ruling being: 'The trial judge has a better opportunity than

have we to pass upon the credibility of witnesses, and his determination may not be lightly overridden, especially on an issue of veracity. l. c. 688.

"Liggett & Meyer Tob. Co. v. Meyer (1935), 101 Ind. App. 420, 194 N. E. 206, 210, involved the advertisement 'No, thanks; I smoke Chesterfields,' plaintiff asserting common law rights therein and resting recovery upon an implied contract. In affirming a judgment for plaintiff, the court said: 'This is a common-law action. The laws of the common law are continually changing and expanding with the progress of the system in which it prevails. It does not lag behind, but adapts itself to the conditions of the present so that the ends of justice may be reached. While we recognize that an abstract idea as such may not be the subject of a property right, yet when it takes upon itself the concrete form which we find in the instant case, it is our opinion that it then becomes a property right subject to sale. Of course, it must be something novel and new; in other words, one cannot claim any right in the multiplication table.'

"In Keller v. American Chain Co. (1930), 255 N. Y. 94, 174 N. E. 74, 75, recovery was defeated because a relation of trust and confidence or a necessity for square dealing entitled the defendant to the receipt of the information in the circumstances involved; but the court considered information leading to defendant's recovery of $3,384.33 of overcharges in freight rates sufficient to sustain an express contract to compensate plaintiff therefor in ordinary circumstances; stating: 'That information may be a valuable consideration for a promise to pay for it finds support in Bristol v. Equitable Life Assur. Soc. of New York, 132 N. Y. 264, 30 N. E. 506, 28 Am. St. Rep. 568; Haskins v. Ryan, 75 N. J. Eq. 330, 78 A. 566; McLaughlin v. Barnard, 2 E. D. Smith, 372; Green v. Brooks, 81 Cal. 328, 22 P. 849; Cobb v. Cowdery, 40 Vt. 25, 94 Am. Dec. 370; Reed v. Golden, 28 Kan. 632, 42 Am. Rep. 180.' Concerning the holding in Soule v. Bon Ami Co. (201 App. Div. 794, 195 N. Y. S. 574, 235 N. Y. 609, 139 N. E. 754), the court said: 'The Soule case was affirmed in this court on the ground that the plaintiff failed to prove profits as the basis for his recovery.'

"Consult Elfenbein v. Luckenbach Terminals (1933), 111 N. J. L. 67, 166 Atl. 91, 93 [1]; Taylor v. Burr Printing Co. (1928), 26. Fed. 2d 331, 332 [1]; American Mint Corp. v. Ex-Lax, Inc. (1941), 263 App. Div. 89, 31 N. Y. S. 2d 708, 709, pointing out that Healey v. R. H. Macy Co., Inc. (1938), 277 N. Y. 681, 14 N. E. 2d 388, affirming 251 App. Div. 440, 297 N. Y. S. 165, sustained a recovery on an implied contract to pay for an idea, scheme or plan for Christmas advertising used by defendant; Shapiro v. Press Pub. Co. (1932), 235 App. Div. 698, 255 N. Y. S. 899; Brookins v. National Refining Co. (1927), 26 Ohio App. 546, 160 N. E. 97, 17 C. J. S. p. 434, n. 62; 34 Am. Jur. p. 402 et seq., Secs. 4, 5, 18, 19; 1 Williston, Contracts,

1236

p. 214, n. 5, p. 391, n. 11; How J. Ryan & Associates v. Century Brewing Ass'n., 185 Wash. 600, 55 Pac. 2d 1053, 104 A. L. R. 1353, 1357, (referring to 17 A. L. R. 760, 30 A. L. R. 615, for cases on protection against appropriation of advertising matter and methods); 73 U. S. L. R. 4; 72 U. S. L. R. 439; 67 U. S. L. R. 595; 19 Mich. L. R. 874. See 4 Mo. L. R. 239; 19 St. L. L. R. 323; 14 Minn. L. R. 537; 27 Mich. L. R. 708; 25 Mich. L. R. 886.

"Plaintiff, after two years' labor, reduced to writing a somewhat comprehensive scheme for use by department stores to increase the number of their charge account patrons. On the theory their prosperity depended upon their steady customers, he considered a large number of charge accounts their most valuable asset and the organization of the employees into teams for the purpose of a contest, with suitable awards, to secure new charge accounts the important features of his plan. No copyright or patent right is involved. Plaintiff's plan covered approximately four pages of the printed record and embraced a number of details. It first set forth certain advantages to be had from and reasons for an 'employee's sales campaign and contest.' Under the heading 'Rules of the Contest,' it provided for: (1) A name for the contest. (2) A 'duration' of thirty days. (3) The submission of all 'prospects' to the credit department for approval before solicitation. (4) Restricted the accounts to new accounts or accounts inactive for a year. (5) All employees who volunteered, signed pledge cards and agreed to abide by the rules could participate. (6) Absences, dismissals and resignations did not deprive participants of their share in the prizes and awards. (7) Authorized employees of the credit department to participate. (8) Excluded consideration of customers who applied for credit in the usual way, without solicitation. (9) Prohibited solicitation of cash customers in the store. (10) Based prizes and awards on the active accounts accepted by the credit department, defining an active account as one showing purchases of $5 during the contest. Provided for 'prizes and awards': (1) in cash. (2) A grand prize of $200 for high division. (3) A grand prize of $50 for high individual. (4) A grand prize of $50 for high captain; all to be made at close of contest: (5) Awards of 50 cents for each new active account and $1 for each new ▬▬ active account showing purchases of $25. (6) An award of 20 cents to the team captain for each account opened by his team. (7) Weekly cash prizes for the five high individuals, ranging from $25 to $3. (8) All awards, except weekly prizes, were based on points to take care of possible differences in the number of individuals belonging to the different teams. There were instructions on how to secure new charge account customers, and blank form of applications for a charge account.

"Plaintiff testified: 'After I got the plan developed, I offered it to Scruggs [Scruggs-Vandervoort-Barney, Inc., another large depart-

ment store in St. Louis] first.' They accepted it and used it. [This was about February 15, 1930.] Then I offered it to Stix, Baer & Fuller a week later, in the beginning of March, 1930,' Plaintiff was first referred to Mr. Leo C. Fuller, who was a vice president of defendant corporation. 'I told him I had a wonderful plan here. It would produce at least a million dollars worth of business for the next ten years. I presented the plan to him by writing. I also tried to sell him the plan.' 'Mr. Fuller said that was a wonderful plan and asked me—he said: "What do you want for your plan and your service?" I told Mr. Fuller the plan has never been used before; that I would like for the store to use it first and then see how many—what it would produce, and then we could make some arrangement for settlement. He said: "That is all right." ' Mr. Fuller had his secretary take plaintiff to Mr. Wolfort, defendant's credit manager, and he showed his plan and literature to Wolfort. Plaintiff testified: 'We spoke for maybe an hour and Mr. Wolfort said, "Well, this is a very fine plan." He said, "You can't criticize that plan." I said, "No." I said, "I will just leave it with you"; and I did. I didn't talk to him about the matter of compensation.' Thereafter, plaintiff called at defendant's, making inquiry and urging the use of his plan. These efforts continued subsequent to May 13, 1930. He would be informed, particularly by Wolfort, that defendant was working on 'that particular plan.' Plaintiff informed Wolfort that Scruggs was using his plan. Upon Wolfort questioning the success of the Scruggs' campaign, plaintiff showed Wolfort its progress and Wolfort admitted it was pretty good. The Scruggs' campaign was a thirty-day contest, which started sometime prior to March 15, 1930. Defendant's campaign and contest began July 15, 1930, and continued into September, 1930. Plaintiff learned of defendant's campaign. He called on Wolfort, who told him: 'Your plan produced 8,000 new accounts.' 'He said it was equivalent to about four apiece—there are about 2,000 employees in the store.' Thereafter, plaintiff saw Mr. Fuller, and told him what Wolfort had said; 'that the plan was a success and I would like to get my money. And Mr. Leo Fuller said, "Well," he says, "I am certainly—I am satisfied to pay you if the rest of them are." He says, "You have to go to see Mr. Koehler, the manager of the store." Mr. Koehler said: "Well," he says, "I don't know you. I never heard of you before." . . . "Well," he says, "you have to go to Mr. Wolfort, that is the man you have to see." So, I went to Mr. Wolfort and he says, "No, I didn't hire you. I can't do anything for you." ' Defendant refused to make payment.

"There was evidence adduced that defendant made an effort in the early part of 1930 to secure new charge accounts by writing letters to prospective customers, but concluded this campaign was not meeting with success; that sometime after plaintiff's interview with Messrs. Fuller and Wolfort, defendant had a conference of the heads of its departments, which was attended by Messrs. Buckland, Car-

michael, Webster, Feitel and, possibly, a fifth man, whose identity is not disclosed of record. Plaintiff's exhibit 'W' was identified as a draft (the original or an early revision) of a plan for an employee's campaign to secure new accounts, the result of the conference of defendant's department heads. This draft advanced reasons for such a campaign, stating defendant had adopted 'several months ago' the practice of rewarding employees for obtaining new charge accounts; that little had been done to promote the interests of employees and the possibilities 'of the idea' had never been realized; that the mere announcement recently employed (to pay fifty cents for each new account) had been inadequate to arouse enthusiasm, and that the campaign should be organized along competitive lines to secure an original interest and to sustain such interest. This was followed by an 'outline of the plan,' viz.: (1) All employees were considered participants. They were to be organized into teams, with captains. (2) Employees were to make monthly pledges of the number of new accounts they thought they could obtain. (3) The names of those pledging five or more new accounts were to be displayed. (4) At the end of each month those who made their pledge were to be encouraged to increase it for the next month. (5) A list of the teams, in the order of their standing, was to be posted, the determination of the ranking to give consideration to the number in the team and the accounts secured. (6) An honor roll of the three leading individuals was to be maintained throughout the campaign, as was (7) an honor roll of the three leading teams. (8) The first period of the campaign was to close with the Anniversary Sale, and prizes, ranging from $15 to 5, were to be awarded (a) to the three leading individuals, and (b) to the captains of the three leading teams, and (c) a grand prize of $25 to the person having the highest standing. Under the head 'Miscellaneous' we find, among other things, provisions for the payment of fifty cents for each new account, a preliminary announcement, subsequent announcements, etc. This draft underwent several revisions and was finally published, after fourteen teams had been organized, in short form, embodying five paragraphs, viz.: (1) Employees were to sign pledge cards each month. At the end of each month, the names of the employees securing five or more accounts, of the leading individuals, and of the three leading teams were to be placed on an honor roll. (2) Each new account paid fifty cents, payable upon opening. The campaign was to end with defendant's Anniversary Sale; when cash prizes, ranging from $25 to $10, were to be awarded to the three leading individuals and like prizes to the captains of the three leading teams. (3) Team ranking was to be determined on the adjusted basis. (4) Consideration was not to be given to absentees on the individual teams because it was thought this would be virtually equal in percentage. Employee charge accounts were not counted. Employees were to be notified as soon as applications were accepted. (5) Section man-

agers were to have charge of the applications. (6) Contest started July 15. 'Watch for further details.'

"Mr. Fuller and Mr. Wolfort denied making any contract with plaintiff, and the details of the conversations plaintiff testified he had with them. They claimed they had never seen plaintiff's plan. There was evidence that defendant conducted a campaign in 1916 to secure new charge accounts wherein prizes ranging from $100 to $10 were offered to 'members securing the largest number of acceptable new charge accounts during' a six months' period; that defendant conducted a contest by teams to sell merchandise in 1927; that Kline's, Inc., of Kansas City, Missouri, conducted a contest by teams to secure new charge accounts in 1929 which was very similar to the plan submitted by plaintiff; and that campaigns somewhat similar to plaintiff's had been conducted by other stores. There was also testimony that defendant's 1930 employee's campaign and contest originated at the conference of the heads of the several departments of defendant. Mr. Webster testified he originated it. Mr. Carmichael testified he wrote exhibit 'W' from notes taken at the conference of the department heads.

"A report made in December, 1930, by defendant's Research Department mentioned the letter campaign and the employee's contest for new accounts and compared the results. From this it appears that the letter campaign was originally instituted and thereafter, on account of poor results, the employee's contest followed. It showed that the letter campaign added seventy-nine new accounts at the cost of $13.15 per account, and that the employee's contest added 2,592 accounts at a cost of $1.03 per account.

"The jury found the issues for the plaintiff. It was for the jury to say whether a contract had been entered into and we think, although it may be close, whether defendant in its employee's campaign and contest for new charge accounts modified plaintiff's plan to conform to defendant's ideas for a successful campaign and contest or made use of a plan devised by defendant's employees or some other person and known to defendant.

"Under the instructions, defendant's as well as plaintiff's, the jury were required to and did find that plaintiff was the originator of the plan and that the plan was new, novel and useful. The case is well within the observations that one may protect by contract an idea thought to be useful."

Complaint is made of the rejection of defendant's offer to prove by the witness Leo C. Fuller, vice-president in charge of merchandise of defendant, that it was a rule of the company that every contract must be in written form, and that no contract for over $500.00 should be passed upon by any individual member of the firm, but must be referred to the board of management. This was offered for the sole purpose of showing that a contract of the kind in question

"would not likely be entered into by Mr. Fuller, or any officer of the company." Here the transaction was clearly described by the witnesses, plaintiff testifying directly to the contract, and defendant's witnesses to the contrary. Even if evidence of such a rule or custom be regarded as relevant, it does not follow that its exclusion constituted reversible error, this because the admission of collateral matters tending indirectly to prove a controverted issue, is largely discretionary with the trial court.

The defendant contends the court erred in admitting testimony of defendant's sales auditor (called by plaintiff) concerning the total number of charge accounts over a period of years in defendant's store and the total amount of such charge accounts. This was done for the purpose of showing the average amount of purchasing done on each account. The ground of complaint is that it had no tendency to prove any issue in the case. A like objection is raised with respect to the admission of testimony given by the witness Feitel to the effect that the percentage of gross sales allowable for obtaining new business was 3½ to 4% of all sales. We do not agree that said testimony had no tendency to prove the value of the plan. It is not disputed that at least 2,592 new charge accounts were added as a result of the contest. It was shown that defendant had no record showing the sales on such accounts. The court therefore permitted the average purchases on all charge accounts to be shown. We think the extent of the use of the accounts, as measured by the volume of sales, would be admissible. Ryan v. Century Brewing Ass'n., supra. And in that connection it would not be improper to show the permissible limits of outlays for the acquisition of new business. Nor do we think the cross-examination of defendant's witness Klaman (wherein he was interrogated concerning the value of the services of an architect in drawing plans and specifications, and the value of the services of an attorney in preparing briefs) had such a tendency to mislead or confuse the jury as to require a reversal.

This brings us to a consideration of the propriety of certain of the instructions, and as to whether the verdict is excessive, questions whereon a new trial was ordered at the last submission of the case.

While plaintiff's instruction No. 1[1] is not to be regarded as

---

[1]"The Court instructs the Jury that if you find from the evidence that the plaintiff invented and devised a plan for the use of department stores in securing new charge account customers, and if you further find that plaintiff offered to sell the use of said plan to defendant for its reasonable value, said reasonable value to be determined and paid after defendant had used said plan and had found what it was worth in results, and if you further find that defendant thereupon did accept said plan and use the same, and did obtain a number of new charge account customers by reason thereof, an if you further find said plan was of value to defendant, but that the defendant did then refuse and still refuses to pay to said plaintiff an amount equal to the reasonable value of said plan, your verdict shall be for the plaintiff and against the defendant."

a model as a recovery instruction, we have reached the conclusion it is not reversibly erroneous. So much of the complaint against it as is based on the failure to submit the matter of an agreement to negotiate an agreement (i. e., a test and trial, after which there was to be an agreement "found" for the reasonable value of the plan) is ruled by what was said in holding plaintiff's petition to be on a contract for reasonable compensation, and that his proof thereunder was sufficient. The further complaint is made that by said instruction there was submitted to the jury, and it was permitted to find, without any basis in the evidence, "that defendant thereupon did accept said plan and used the same." This objection is in substance and effect that plaintiff failed to. make a submissible case, because the plan used by defendant was not that submitted by plaintiff. It is true there were differences in the details of the two plans, but we are not prepared to hold that, as a matter of law, they were fundamentally and basically different. On the contrary, we think they were so substantially similar as to make it a jury question whether defendant accepted and used plaintiff's plan. As the petition did not rely on any rights accruing to plaintiff by virtue of a copyright, either common law or statutory, the jury was not required to find whether or not plaintiff had published his plan prior to the claimed use by defendant, or whether or not he had an exclusive property right therein.

█ The complaint against plaintiff's █ instruction No. 2,[2] is directed to that portion which authorized the jury to "consider net results, if any, secured for defendant by said plan," in that it failed to take into account the part defendant's employees took without any aid from plaintiff in the execution of the plan it used; and in failing to confine "net results to those attributable to plaintiff's plan," left the jury to roam at large as to the reasonable value of the plan. Under plaintiff's petition and proof, it was the reasonable value of the plan to defendant for which it was obligated to pay, and this is the measure of damages submitted by the instruction. True it is general, but it does not misstate the law, and is well enough, as far as it goes. Had defendant desired more specific directions touching the matter, and prohibiting any improper method of calculation likely to be adopted, it should have requested instructions to such effect. The fact that this is an action on contract is not, as defendant contends, conclusive against the application of this rule, which is ordinarily followed in personal injury cases. Moreover, we observe that defendant requested, and the court gave, an instruction which told the jury, in express

---

[2]"If you find for the plaintiff and against the defendant, your verdict shall be for such amount as you shall find was the reasonable value of said plan to said defendant, not exceeding $96,000, the amount sued for. In determining reasonable value you may consider the net results, if any, secured for defendant by said plan."

terms, that the measure of damages could not be arrived at through guesswork or conjecture, "and if after fairly considering the evidence, you cannot determine the value of the plan in question, then such verdict if in favor of the plaintiff can only be for a nominal amount." For the foregoing reasons, we think it apparent that defendant's contention should be disallowed. In view of our holding that no common law copyright is involved, it becomes unnecessary to discuss the objections raised to plaintiff's instruction No. 4.

On the last submission of this cause we held the verdict to be excessive, and to that view we are constrained to adhere. By appellant's own admission, 2,592 new charge accounts were secured as a result of the contest in question, the total cost of which was $2,863.18, or $1.03 per account. Earlier in the same year defendant had carried on a direct mail campaign under which 79 new accounts were added, at a net cost of $13.15 each. Concerning the latter, defendant's witness Wolfort was asked the direct question if "the results were not pretty poor," to which he answered, "Yes, *on numbers*." From this it is argued, with some plausibility, that the jury might infer that the direct mail plan was not objectionable on the score of excessive cost, but was unsatisfactory only as to the quantity produced. From the foregoing, it appears that the difference in cost per account under the two methods was $12.12. The plaintiff, therefore, argues that the jury would have been justified in returning a verdict for such difference, or an aggregate of $31,415.04. It was developed on the cross-examination of one of defendant's witnesses, who qualified as an expert in department store advertising, that between $3\frac{1}{2}$ and 4% is the allowable percentage of gross sales for the acquisition of new business. Moreover, there was evidence tending to show that from 1930 to 1938 the average purchase on each of the store's charge accounts (averaging approximately 65,000) was $1,074.59. There was, however, no substantial evidence showing the average life of defendant's charge accounts. The nearest approach being the testimony of one of the vice-presidents that while he did not know the average life of such accounts, he was sure that they "had accounts with the grandmother, mother and daughter. I know some of them have had charge accounts in our place ever since we have been in business [45 years]." Another witness testified to such accounts having been on defendant's books for 10 years. We do not think it can be said, nor did the jury find, that plaintiff was entitled to be compensated at the rate of $12.12 per account, which, as indicated, represents the difference in the expense of procurement under the two systems above-referred to. The amount actually allowed was on the basis of approximately $7.70 per account, a sum which we regard as disproportionate to the loss sustained by reason of defendant's breach of its contract. We have concluded that $10,000.00 is the maximum sum for which the judgment should be permitted to stand, under the

proof adduced, but in so saying, we are not to be understood as holding that plaintiff cannot, in any event, recover in excess of said amount. If plaintiff will, within ten days, enter a ▮▮▮ remittitur of $10,000.00, the judgment will be affirmed, as reduced; otherwise, it will be reversed, and the cause remanded. All concur except *Gantt, J.*, absent.