Robert D. HOUGH and Jereda M. Hough, Plaintiffs-Respondents,

v.

JAY–DEE REALTY AND INVESTMENT, INC., a corporation, Defendant-Appellant.

No. 8457.

Springfield Court of Appeals.

Missouri.

March 17, 1966.

William A. Wear, Wear, Wear & Coffman, Springfield, for defendant-appellant.

Arch M. Skelton, Donald E. Bonacker, Skelton & Bonacker, Springfield, for plaintiffs-respondents.

PER CURIAM:

This was an action for breach of the defendant's covenant to construct and deliver possession of a restaurant building to the plaintiffs. The plaintiffs have had judgment on a jury verdict for $3,100.00, and

the defendant has appealed. This is a second opinion, the first having failed of adoption.

■ Stated most favorably to the result reached, the evidence was that in 1961 the defendant corporation was developing a small tract of land near Springfield, Missouri, for commercial use. As part of its general plan of development, the corporation had in view the construction of a restaurant building, a service station, a motel, and possibly other structures. Plaintiff Robert Hough, an experienced restaurant-keeper, was then running a "tiny little restaurant, a one-man operation." During the latter part of March or early in April 1961, Mr. Hough was introduced to Mr. John Dukewits, the defendant's president, and the two began negotiation of the lease or contract in issue.

The course of the parties' preliminary negotiation can only be determined by inference, since they reduced their agreement to writing, but we take it that Mr. Hough and Mr. Dukewits struck a bargain—made a deal—sometime before the contract was drawn. At any rate, believing it to be necessary, and anticipating the commencement of his new business, Mr. Hough closed the small restaurant on April 8, 1961, and began devoting his full time to preparations necessary for the establishment and operation of the new one. On May 8, 1961, having come to specific terms, Mr. Hough and his wife and the defendant executed a written "Lease Agreement," which is the basis of this action. Couched in terms of a lease to commence in the future, the memorandum is lengthy and involved, and it is unnecessary to set forth its terms in detail. It provides, among other things, that the defendant as lessor will construct a building for plaintiffs' occupancy and use as a restaurant, and that the building will be ready for use on June 1, 1961. The respondents, as lessees, are required to equip and furnish the restaurant, subject to defendant's approval of the equipment and furnishings, and to pay a

variable or "percentage" rental monthly, the amount ranging from a minimum of $235.00 to a maximum of $600.00, depending on plaintiffs' gross sales. The lease agreement is signed by both plaintiffs as lessees and by Mr. Dukewits for the defendant corporation as lessor. It was received in evidence without objection. Both parties treat it as a valid and binding contract on this appeal, and we shall regard it as such.

Basically, the plaintiffs' theory of recovery, as presented in this court, is that because the appellant failed to complete the promised construction and deliver possession of the premises they are entitled to reimbursement for all expense incurred in preparation for and in part performance of their obligations under the contract. As we understand them, they concede that their loss of profit because of the breach of contract cannot be ascertained, nor can their damages for breach of covenant to deliver possession be calculated according to the usual measure.

The plaintiffs had evidence that as soon as they had made their deal, or believed they had, Mr. Hough began preparation for performance of his obligation. The parties are not in agreement whether the defendant, or at least Mr. Dukewits, knew or anticipated that Mr. Hough would close his small restaurant to begin these preparations, but plaintiffs' evidence was that it was "discussed," and that Mr. Dukewits said he felt Mr. Hough should do so. Acting in reliance upon defendant's assurances, or upon what plaintiffs described as an antecedent oral contract, Mr. Hough began attempting to locate the furniture, fixtures, supplies and employees necessary to establish the new restaurant.

Neither party was very specific or precise as to the kind or type of establishment to be set up: there is no reference to other existing restaurants to guide us. However, from the testimony concerning the kind of equipment to be installed, its estimated cost, the number of prospective em-

ployees, and the repeated vague references to a "first class restaurant," we take it that the parties had in view the establishment of a fashionable public eating house, at least by community standards. After April 8, Mr. Hough's activities consisted of contacting prospective employees, " * * such as waitresses, dishwashers, cooks, and a hostess," and he had to "line up the kitchen equipment, not only the larger items such as stoves, refrigerators, but small items such as pots and pans and salt shakers, and things like that." Mr. Hough also "had to make arrangements for food products. I had to contact wholesale houses, places to purchase meats, groceries, and produce houses." It was also necessary to make trips to St. Louis and Joplin, Missouri, to select fixtures and equipment, and to spend some time arranging the necessary financing for this equipment, which was finally obtained through a St. Louis supplier. Mr. Hough emphasized the necessity of selecting the equipment carefully, because Mr. Dukewits had said "he just didn't want any sleezy, used old equipment," and Hough's means were limited.

The defendant, and particularly its officers procrastinated. In spite of Mr. Hough's preparations, no progress was made toward the construction of the building. Although Mr. Hough "went daily to the place to see what progress was being made," "it was a rare occasion when I could find anyone out there doing any work." Though his approval of Mr. Hough's purchases was required by the contract, Mr. Dukewits was extremely difficult to locate and on one occasion went on an extended vacation. Mr. Hough's efforts to hasten construction were frustrated because of his difficulty in contacting Mr. Dukewits, and when Mr. Dukewits' permission or approval of something was required he was dilatory in giving it. On June 1, the proposed completion date, the building was "totally inoperable." Mr. Hough decided to continue performance, but advised Mr. Dukewits "that I was be-coming desperate, that I had no income * * * and that I desperately needed to get the place open." Being assured that construction would be hastened, Hough waited, attempted to get some of the building done himself, and in fact did some of the decorating, for which he was paid. Still, the proposed restaurant was "far from being completed" on July 31, 1961, sixty days after the agreed completion date, and the plaintiffs thereupon terminated the agreement in writing.

This, of course, states the evidence most favorably to the plaintiffs. The defendant's evidence was that the proposed restaurant was in fact substantially complete even on June 1, except for some minor details which could have been completed in ten days' time. The defendant's officers, including Mr. Dukewits, testified that the plaintiffs would have been put in possession very promptly had Mr. Hough given any convincing assurance that he had purchased the necessary equipment, and had he tendered the rent in advance, as the contract for lease required. As a matter of fact the defendant's evidence was that Mr. Hough had been financially unable to comply with his obligations under the lease agreement and begin operation of the restaurant. Some of plaintiffs' suppliers had asked the defendant to act as Hough's surety as a condition to extending him credit, but the defendant had refused because it had no interest in operating the restaurant and did not consider such an arrangement feasible. Considerable proof was adduced by both parties about the stage of completion the building had reached when Mr. Hough terminated the agreement on July 31. For present purposes, it is enough to say that the evidence was irreconcilably in conflict whether the building was, as plaintiffs maintained, so incomplete that it could not have been used as a restaurant, or whether, as Mr. Dukewits testified, the restaurant could easily have been put in operation by June 10, had Mr. Hough lived up to his agreement.

We take and consider the case solely upon the questions presented by the appellant: other issues were developed during the trial, but they have not been briefed and are therefore considered abandoned or waived and no longer in the case. Brackett v. Easton Boot and Shoe Co., Mo., 388 S.W.2d 842, 844 [1]; Pruellage v. De Seaton Corp., Mo., 380 S.W.2d 403, 405 [3]; White v. Kuhnert, Mo.App., 207 S.W.2d 839, 840 [1]. The appellant's first point is that the trial court should have directed a defendant's verdict at the close of all the evidence because the plaintiffs made no proof of actual compliance with their obligation to furnish the restaurant and tender the advance rent. The appellant concedes it was not prepared to comply with its obligations; their statement in argument is that "the building was not 100 per cent complete as far as the Defendant's obligations were concerned." They nevertheless assert that since the plaintiffs had made only the necessary arrangements to obtain equipment and fixtures, it cannot be said that the plaintiffs complied with the contract requirement, which was to supply "* * * all furnishings, fixtures and equipment used in said premises" at their "sole cost and expense."

The evidence bearing on this point was that after looking at a good deal of equipment at various places, the plaintiffs had been able to obtain restaurant fixtures on credit from a supplier in St. Louis, locally represented by a Mr. James Cole. Mr. Hough had made inquiry of Mr. Cole some time before the lease agreement was executed, and after inspecting the premises and making a "layout" he had proposed a "turnkey" job, a complete installation on a lease-purchase arrangement or on a "straight finance." At first, Mr. Cole was unable to obtain credit approval for the arrangement Mr. Hough had in mind, but eventually Mr. Hough agreed to make a down payment of ten per cent, obtained a surety for the purchase money note, and the proposed deal was approved. Mr. Cole then contacted a Mr. Tom Prophet, one of the defendant's officers, and asked for a "landlord waiver," which is here described as a "waiver where we could remove the equipment in case of default payments."

Mr. Hough never implemented these arrangements fully, as the appellant points out, but plaintiffs' evidence was that the credit arrangement "would have been good one year," and "within ten days the equipment could have been delivered and installed." So far as Mr. Hough's willingness or ability to provide the necessary equipment was in issue, therefore, there was substantial evidence to sustain the proposition that he could have performed at any time, had the building been ready for occupancy.

The plaintiffs did not, however, proceed merely upon the theory that the contract had been breached by outright bona fide failure to finish the building. Though they withdrew their pleaded complaint that there had been some sort of tortious interference with the contract by Mr. Dukewits as an individual person, a most important aspect of their case was that the defendant had been so inattentive and dilatory in its performance as to prevent theirs. Put in homely language, they had "got the run-around." It was the indifference and inattention of the corporate officers, so their proof ran, which prevented their obtaining the step-by-step approval of their performance required by the contract. Not only did the lease agreement provide that this approval would not be unreasonably withheld, but there is a promise implied in every contract not to prevent or hinder performance by the other party. 5 Williston, Contracts, Section 1293A (Rev. ed. 1937). If the respondents' evidence is taken as true, the actions of the defendant were such as to constitute actual prevention of performance, thus excusing the plaintiffs' failure to install the fixtures, so long as they were readily available. Cable v. Wilkins, Mo.App., 352 S.W.2d 50, 52–53 [6]. We believe there was

substantial evidence to support the jury's finding that the contract had been breached by the defendant. Unless the issues depend solely upon a construction of its terms, and when the evidence is in conflict and reasonable minds might differ, the question whether a party to a valid and subsisting contract has breached it is essentially one of fact. Schwartz v. Shelby Construction Co., Mo., 338 S.W.2d 781, 787–788 [2–5]; 17 Am.Jur.2d Contracts, Section 355, pp. 793–794; 17A C.J.S. Contracts § 630a, pp. 1266–1267. In this case the validity and existence of the contract is admitted. The parties agree substantially what performance was due from each, and since they have placed their own construction on the terms of the lease agreement, we are willing to give effect to their understanding of their own language. The St. Louis Gaslight Co. v. City of St. Louis, 46 Mo. 121, 128; Wentzel v. Lake Lotawana Development Co., 226 Mo.App. 960, 977, 48 S.W.2d 185, 195. The controversy presented on the issue of a breach of contract was essentially factual, a matter for the jury's resolution. This point is ruled against the appellant.

■■ Much more to the point is appellant's contention that the verdict is excessive. The usual measure of damages for breach of covenant to deliver possession of leased premises, or breach of contract to lease, is the difference between the rent reserved and the reasonable rental value of the premises. Chouteau v. Missouri-Lincoln Trust Co., 310 Mo. 665, 683, 276 S.W. 49, 54 [8]; Hughes v. Hood, 50 Mo. 350, 351–352 [1]; Anno., 88 A.L.R.2d 1024, 1027, 1032 (1963). Obviously that measure of damages cannot be realistically applied in this case. The proposed restaurant was never completed. Another tenant did subsequently occupy the premises, but a "complete new set of plans" were drawn for him. Moreover, the rent reserved in this case was to be a "percentage" rental, varying from month to month according to the respondents' gross sales. Their business was never actually begun. Plaintiffs rec-ognize the impossibility of recovery based on the usual measure of damages and deny that they seek to recover lost profits. Instead, they seek to be compensated only for their expense, or out-of-pocket loss, incurred in preparation for and in part performance of the contract. In the peculiar circumstances of this particular case, we consider such an alternative measure of recovery to be proper. Douglass v. Guardian Holding Corp., 132 Cal.App. 585, 23 P.2d 80; Shaboub v. De Lacie, Tex.Civ. App., 59 S.W.2d 954; 5 Corbin, Contracts, Section 1035, pp. 211–213 (1964); 22 Am. Jur.2d Damages, Section 161, pp. 230–231. The question is whether, by this measure, the amount allowed was excessive.

■ Plaintiffs' evidence was that approximately one month before the lease agreement was executed he closed his own small restaurant and began giving full time to preparation for the new enterprise. We have recited his testimony (and it is not very specific), but, construed most favorably to the result reached, it tends to prove that after April 8 and up to July 31 Mr. Hough spent all his time shopping for various items of equipment and furnishings, making arrangements to purchase them, contacting prospective employees and suppliers, and, after June 1, attempting to obtain performance by the defendant, or, in Mr. Hough's words, trying "to get this place going." As a measure of the value of his time, Mr. Hough testified that his income from the "one-man" restaurant was approximately $200.00 per week, and that he generally had earned from $8,000.00 to $10,000.00 per year in the restaurant business. From a consideration of all the evidence, it appears that the award was calculated by allowing the plaintiffs the value of Mr. Hough's time from April 8 to July 31 at approximately $200.00 per week, less a deduction for the painting—approximately two days—for which he was paid. We see no basis for any deduction; the defendant hired Mr. Hough to paint, and the construction of the building was the defendant's sole responsibility. We further

consider the appellant's specific objection that the award represented an attempt to compute lost profits to be untenable. Mr. Hough testified concerning the time he lost, and, in our view of the matter, the sum awarded here does not necessarily represent a recovery of lost earnings; rather it represented an award for time lost in preparation for and in part performance of the contract, measuring the value of the time lost by Mr. Hough's loss of earnings, and it was proper. Shaboub v. De Lacie, supra, 59 S.W.2d at 956 [1, 2].

■■ We must nevertheless agree that the award was excessive. However the jury calculated the amount of damages, we have the view that no allowance should have been made for the period from April 8 to the execution of the written agreement on May 8. Plaintiffs' expenditures during that period were not referable to the contract or its breach. Expenses incurred during preliminary negotiation are not usually recoverable in an action for breach of contract, 5 Corbin, op. cit., Section 1034, p. 207, 22 Am.Jur.2d Damages, Section 158, pp. 226–227, and in this case they were incurred before any enforceable obligation arose, since the contract was required by the Statute of Frauds to be in writing. Newkirk v. Moley, Mo.App., 343 S.W.2d 213, 216 [2]. Insofar as the award represents an allowance for expenditures from April 8, 1961, to May 8, 1961, it is excessive. On the other hand, a jury might properly have made an allowance for the period from May 8, 1961, to July 31, 1961, at $200.00 per week, which would justify an award of $2,400.00.

■ Several other points are raised by the appellant, three of which are directed to the instructions given and refused by the trial court. They are: (1) that the plaintiffs' verdict-directing instruction was prejudicially erroneous because it required a finding of an admitted fact, namely, the existence of a contract; (2) that the plaintiffs' instruction on the measure of damages was so broad and general in its terms

as to be prejudicially erroneous; and (3) that the defendant's tendered instruction submitting the defense of waiver was erroneously refused. The first of these objections we consider to be without substance. Doubtless the existence of a valid contract was a requisite element of the plaintiffs' case, but the defendant admits there was a valid contract. By requiring a finding that there was a contract, the plaintiffs simply assumed an extra burden, which gives the defendant no ground for complaint. Henderson v. Dolas, Mo., 217 S.W.2d 554, 557 [6, 7]; Burneson v. Zumwalt Co., 349 Mo. 94, 104–105, 159 S.W.2d 605, 609–610 [3–5]; see also Niehaus v. Schultheis, Mo.App., 17 S.W.2d 603, 604 [4]. We can see no possible prejudice to the defendant resulting from the superfluous requirement that the jury find an admitted fact. Nor do we believe the appellant has any cause to complain of the generality of plaintiffs' instruction on the measure of damages. The fact that the action sounds in contract rather than in tort does not prohibit the submission of damages in general terms, so long as the instruction contains no positive misdirection; and if the defendant wished to prohibit any improper method of calculating damages, it should have offered a clarifying or limiting instruction. Brunner v. Stix, Baer & Fuller Co., 352 Mo. 1225, 1241–1242, 181 S.W.2d 643, 652; Norman v. McLelland, Mo.App., 354 S.W.2d 906, 912 [8, 9] [10]. In this connection, we note that the verdict-directing instruction conditioned a plaintiffs' verdict on a finding that plaintiffs had sustained damage as a direct result of defendant's breach of contract, and the jury was confined to a consideration of the facts in evidence by other instructions. In our opinion, there was no prejudice because of the generality of the instruction on the measure of damages. The last point directed to the instructions is that the court erred in refusing the defendant's instruction tendering the defense of waiver. We think there was no error in refusing the instruction,

which advised the jury that if time were found to be of the essence of the contract, and plaintiffs' conduct amounted to a waiver of strict performance, then the plaintiffs could in no event recover. This instruction misstates the law. Even if time were of the essence of the contract, and we do not believe it was, plaintiffs' voluntary waiver of strict performance would not necessarily operate to discharge the defendant from all liability. 17 Am. Jur.2d Contracts, Section 447, pp. 908–909.

▆▆▆ We have also considered appellant's argument that the exclusion of defendant's lease with its subsequent tenant was error, on the ground that the lease, at a lower rent, would have shown the defendant did not deliberately breach its contract in anticipation of receiving a higher rent. No authority is cited and, quite frankly, we cannot see the relevance of the subsequent lease in this case. In any event, we do not consider the exclusion of such evidence to be an error materially affecting the merits of the action, within the meaning of Rule 83.13(b), V.A.M.R.

If, therefore, respondents will remit the sum of $700.00 within fifteen days of the filing of this opinion, then the judgment shall stand affirmed in the sum of $2,400.-00 as of the date of the original judgment. Otherwise the cause will stand reversed and remanded for a new trial on all issues.

All concur.